ORDERED.

**Dated:  February 16, 2024**

Catherine M⸱Ewen

Catherine Peek McEwen
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
www.flmb.uscourts.gov

In re:

The Producers, Inc.,                                    Case No. 8:19-bk-08638-CPM
                                                                     Chapter 7
      Debtor.
_____/

Gregory Faia, et al.,

      Plaintiffs,
v.                                                                  Adv. No. 8:21-ap-00333-CPM

Sigmund Solares, et al.,

      Defendants.
_____/

### ORDER AND MEMORANDUM OPINION FOLLOWING NOMINEE TRIAL

### *Summary*

"Oh, what a tangled web we weave when first we practice to deceive."[1]  Weaving of the

web the Court must untangle for purposes of this opinion began more than a decade ago when four

businessmen — Sigmund Solares, Michael Gardner, Gregory Faia, and Vernon "Butch" Decossas

---

[1] Scott, Walter, *Marmion: A Tale of Flodden Field* (1808), https://nosweatshakespeare.com/quotes/famous/oh-what-a-tangled-web-we-weave/ (last visited Nov. 7, 2023).  Coincidentally, the heart of the dispute addressed in this opinion deals with purported stock options in businesses involving web domain names.

— conspired to devise a scheme to shield millions of dollars' worth of assets belonging to Solares and Gardner from tax liability and creditors' reach.  Solares and Gardner, founders and co-owners of the Debtor in the bankruptcy case to which this proceeding relates, later accused Faia and Decossas of having deceived them over the course of several years and swindling them out of the very assets that the four men jointly plotted together to protect for the benefit of Solares and Gardner.  At one point, Solares even turned on Gardner, accusing him, too, of plotting with Faia and Decossas to con him out of valuable assets.  Solares' accusations led to his initiating litigation against the other three men.  In that same action, Gardner filed a cross-claim and third party demand seeking relief against Faia and Decossas alleging that they fleeced him as well.  Next came a countermove by Faia and Decossas in the form of an involuntary chapter 7 petition filed against the Debtor by a company they jointly owned — at least nominally.[2]  That filing eventually led to what was portrayed to be a global settlement, which this Court was asked to and did approve, ostensibly resulting in a laying down of arms by these four men forever.

But the web weaving continued.  Faia and Decossas now, in a turnabout, accuse Solares and Gardner of engaging in a deceitful plot of their own to surreptitiously reacquire assets that Solares and Gardner released to Faia and Decossas as part of the Court-approved settlement.  Faia and Decossas contend, as plaintiffs in this adversary proceeding, that Solares and Gardner have attempted to dodge the operation of the release by exercising stock options that, facially, but not truly, give close family members of Solares and Gardner the right to exercise them.  Faia and Decossas allege that putting these stock options in family members' names was part of the overall scheme to protect Solares and Gardner's assets:  The stock options were meant to enable Solares

---

[2] The Chapter 7 Involuntary Petition against the Debtor identifies the petitioner as DNC Holdings, Inc., which is owned by Faia and Decossas.  *In re The Producers, Inc.,* Case No. 8:19-bk-08638-CPM (Case Doc. No. 1). For purposes of this opinion, all references to "Case Doc. No." are to documents filed in the Debtor's underlying bankruptcy case.

and Gardner to re-take ownership of their assets if there ever came a time when they needed to but could not do so directly for strategic or legal reasons — not to permit the transfer of their assets to family members for those family members' benefit.

Ironically, then, instead of global peace, these four men once more became entangled in their web of deceit. All four were, it turns out, and at different times for different purposes, "too clever by half," meaning too smart for their own good.[3]

When the web's strands are straightened, they lead to the well-supported conclusion that Solares and Gardner — not their family members — were the true holders of the rights to exercise the options. Therefore, any such rights were released by Solares and Gardner as part of the settlement. Based on this ruling, the Court need not and does not make any determination of whether the stock options at issue were ever put in final form and fully executed.

### *Factual and Procedural Background*

In February of 2017, more than two years before the filing of the involuntary petition that initiated the underlying bankruptcy case, Solares, one of the Debtor's co-owners, filed an action in Louisiana state court (the "Louisiana Action") against Faia and Decossas, the Debtor's former Chief Legal Officer and Chief Financial Officer, respectively,[4] and Gardner, the Debtor's other co-owner, and related business entities.[5] The complaint in that action explains that Solares and

---

[3] William Safire, On Language; Too Clever by Three-Quarters, New York Times Magazine, Nov. 15, 1987, https://www.nytimes.com/1987/11/15/magazine/on-language-too-clever-by-three-quarters.html#:~:text= moral by half.-,",smart for one's own good (attributing this phase to George J. Whyte-Melville's 1985 book, The Interpreter) (last visited Nov. 30, 2023).

[4] Decossas was hired by the Debtor in 2005; Faia was hired in 2009. Trial Tr. vol. 2, 163:8-10. Trial Tr. vol. 4, 27:23-28:8.

[5] Ex. 119 (Second Supplemental and Amended Petition for Damages, *Solares v. Faia, et al.,* Case No. 785-016, filed in the 24th District Court, Parish of Jefferson). All exhibits referred to in this opinion are exhibit numbers in a consolidated exhibit list. *See* Updated Consolidated Exhibit List (Doc. No. 474). The trial transcript reflects instances in which the original numbers used for exhibit identification are discussed. To avoid confusion, the reader must cross-reference the exhibits cited in this opinion to the consolidated list's column identifying the original number when reconciling the testimony and a particular exhibit that is the subject of the testimony.

Gardner (and others) began in 1999 forming several privately-held companies "that provided web hosting, domain name registration, domain parking, and advertising services for internet clients and web search companies . . . [and also] registered and traded in Internet domain names."[6] The complaint states that at their peak in 2007, these companies generated approximately $22 million in profits.[7] The complaint goes on to allege that Faia, Decossas, and Gardner conned Solares out of valuable business interests in connection with a three-phase business restructuring plan that began to develop in late 2010 as a means of shielding Solares, Gardner, and assets of theirs worth many millions of dollars from substantial financial risks resulting from creditor litigation and tax liability.[8] Thus, the weaving of the web actually began more than 13 years ago.

The parties to this proceeding generally agree on how this three-phrase plan was structured to play out and how it evolved. As described in the Louisiana Action complaint, the first phase of the plan involved Solares' renouncing his U.S. citizenship, moving abroad, and transferring to Gardner all of Solares' ownership interests in the many businesses that he and Gardner jointly owned, while retaining an option to buy back his original shares from Gardner.[9] In the second phase, Gardner would transfer all ownership interests in these businesses to Solares, while retaining an option to buy back his original shares from Solares.[10] Finally, in the third phase, Gardner would renounce his citizenship, move abroad with Solares, and the two would thereafter own the businesses jointly in equal shares and operate them from outside the United States where, according to the Louisiana Action complaint, "they were less likely to be the target of costly litigation and regulation."[11]

---

[6] Ex. 119.
[7] *Id.*
[8] *Id. See also* Ex. 120.
[9] Ex. 119.
[10] *Id.*
[11] *Id.*

That initial plan, however, went awry. After Solares expatriated and all of his business interests were transferred to Gardner, Gardner decided not to expatriate. Faia then advised Solares that the business interests (still held then by Gardner) could not be transferred to Solares as originally planned.[12] Thus, the third phase of the plan was revised to provide for Gardner's signing off on the transfer of assets of certain wholly owned subsidiaries of the Debtor, The Producers, Inc. ("TPI"),[13] to newly created companies. These new companies were to be held in Faia and Decossas' names. But, according to court filings by Solares and Gardner in the Louisiana Action, the new companies were to still be controlled by them and operated for their benefit until such time as they — who considered themselves the rightful owners of these companies — could take ownership.[14]

In connection with the three-phase plan, Solares and Gardner insisted on the creation of documents (the "Protection Documents") to protect their ownership rights in the new companies, which included — most notably for purposes of this trial — DNC Holdings, Inc. ("DNC"), DOM Holdings, Inc. ("DOM"), and Domain Apps, LLC ("Domain Apps") (collectively, the "Three Companies").[15] The Protection Documents consisted of powers of attorney, irrevocable stock powers, stock certificates, and stock options.[16] The four men arranged to execute the Protection

---

[12] Trial Tr. vol. 5, 38:5-13. *See also* Ex. 119 ("Faia advised that the Three-Phase Plan had to be revised because transferring the Companies direct back into only Solares' name would be illegal.")

[13] TPI started up in January of 2006 as a U.S. holding company that owned foreign companies that held TPI's former operating entities. Trial Tr. vol. 2, 10:19-21. Trial Tr. vol. 5, 33:14-19 and 35:8-23. Prior to December 2010, Solares and Gardner each owned 49.5 percent of the shares of TPI, and another individual, Donald ("Donnie") Simonton, owned one percent. Trial Tr. vol. 2, 10:2-12. Simonton later sold his one percent in TPI to Solares and Gardner. Trial Tr. vol. 2, 73:23-25. As used in this opinion, reference to "TPI" includes TPI and its subsidiaries.

[14] Ex. 119 and 120. *See also* Trial Tr. vol. 3, 56:15-21.

[15] Trial Tr. vol. 2, 51:24-52:7.

[16] Trial Tr. vol. 2, 34:1-8.

Documents in separate "secret" closings that occurred immediately following the transfer of assets from TPI to the new companies in 2011 and 2012.[17]

Fast-forward to two years after the Louisiana Action was filed. In 2019, DNC, one of the Three Companies owned by Faia and Decossas, filed an involuntary petition against TPI, forcing it into a chapter 7 bankruptcy. TPI subsequently consented to entry of an order for relief, and a chapter 7 trustee (the Trustee") was appointed to administer TPI's bankruptcy estate. The Trustee, joined by Solares and Gardner (the two now being aligned), filed an adversary proceeding (the "Joint Proceeding") that sought, among other things, substantive consolidation "with and into the Debtor's estate" of the Three Companies and other entities owned, at least nominally, by Faia and Decossas. The Joint Proceeding raised allegations of fraud similar to those raised by Solares and Gardner in the Louisiana Action.[18] And like the Louisiana Action, the complaint in the Joint Proceeding asserted that Solares and Gardner were repeatedly assured that they had the ability to take 100 percent ownership (50 percent each) of the Three Companies into which valuable assets and operations of TPI had been transferred pursuant to the revised three-phase plan.[19] Between the filing of the involuntary petition commencing TPI's bankruptcy case and the filing of the Joint Proceeding, the Louisiana Action was transferred to this Court after having been removed to the Bankruptcy Court for the Eastern District of Louisiana.[20]

---

[17] Trial Tr. vol. 2, 34:18-22. There were two separate back-to-back "closings" with respect to the transfer of assets to DNC, DOM, and other entities on August 25, 2011. The first was "an outward-facing closing that was supposed to be for the general public," which involved the execution of the sale documents. Trial Tr. vol. 4, 43:6-13. The second one dealt with the protection documents. Trial Tr. vol. 4, 43:14-17. Trial Tr. vol. 2, 36:1-7. Although the transfer of assets to Domain Apps also involved separate sets of sale documents and protections documents, the documents were signed (or, as to some, allegedly signed) by different parties in different locations between May 16 and May 23, 2012. Trial Tr. vol. 2, 75:15-76:11 and 76:18-22. Ex. 68 and 77.

[18] Ex. 119, 120, and 125.

[19] *Id.*

[20] Adv. Proc. No. 8:20-ap-00352-CPM (transferred to this Court on April 30, 2020).

A few months after the Joint Proceeding was filed, Solares moved to convert TPI's case to a case under chapter 11.[21]  In support of that motion, Solares and Gardner filed a proposed chapter 11 plan that called for substantive consolidation into the Debtor of several entities, including the Three Companies, as sought in the Joint Proceeding.[22]  That plan expressly stated that it "exercises those options [to take back assets and operations, the ownership of which was placed temporarily with Faia and Decossas] by funding the option amounts, less a credit for monies taken by Messrs. Faia and Decossas in excess of their agreed upon annual salaries."[23]

Both the Joint Proceeding and the removed Louisiana Action, together with proofs of claims totaling more than $10 million and other issues outstanding in TPI's bankruptcy case, were settled in a global fashion following mediation.  The resulting written agreement (the "Settlement Agreement") purported to resolve all disputes between: (1) Faia, Decossas, and certain entities owned by them, (2) Solares, Gardner, certain entities owned by them, and Gardner's wife Kathryn, (3) TPI, and (4) the Trustee.[24]  Under the Settlement Agreement, Faia, Decossas, and their entities were obligated to pay Solares and Gardner $4.4 million, plus up to another $200,000 to reimburse Solares and Gardner for what they had to pay for chapter 7 administrative expenses, and $10,000 for certain domain names.[25]  In exchange, Solares and Gardner released, among other things, all claims in, and all causes of action of any kind against, the Three Companies.[26]

Based on the Settlement Agreement, TPI's bankruptcy case was converted to a case under chapter 11, with the Settlement Agreement, a related equity agreement between Solares and

---

[21] Ex. 135.
[22] Ex. 142.
[23] *Id.*
[24] Ex. 146.
[25] *Id.*
[26] *Id.*

Gardner,[27] and TPI's chapter 11 plan providing the means of implementing that plan.[28]  The Court thereafter confirmed TPI's plan.  And on June 24, 2021, it deemed the plan to be substantially consummated and closed the bankruptcy case.[29]

A mere month later, on July 23, 2021, Guardian Law, a law firm purporting to act on behalf of Solares' sister, Vivian Cahill, and the probate estate of Gardner's deceased mother, Sandra (or "Sandy") Gardner (the "Gardner Estate"),[30] for which estate Gardner serves as personal representative,[31] sent letters (the "Option Notices") to Faia and Decossas stating their intent to exercise stock options (the "Options") to purchase 100 percent (50 percent each) of the stock of the Three Companies.[32]  In response to the Option Notices, Faia, Decossas, and the Three Companies moved the Court to reopen the bankruptcy case so that they could file a motion to enforce the Settlement Agreement.[33]

After the Court reopened the bankruptcy case, Faia, Decossas, and the Three Companies filed the instant proceeding.  Under Count III of their complaint, plaintiffs seek enforcement of the Settlement Agreement through the Court's issuance of a permanent injunction against Vivian Cahill and the Gardner Estate (together, the "Nominee Defendants"),[34] TPI, Solares, Gardner, their agents, assignees, or designees, from any attempt to exercise the Options to acquire assets that

---

[27] Motion to Approve Compromise of Controversy, Ex. 1 (Case Doc. No. 205).
[28] Order Confirming Chapter 11 Plan (Case Doc. No. 609).
[29] *Id.*
[30] Sandra Gardner passed away on or about August 2, 2020. Trial Tr. vol. 4, 51:7-9.
[31] Trial Tr. vol. 4, 56:4-9.
[32] Ex. 155.  Although the Options give a right to purchase two other entities, Vodun Technologies, Inc. and VMS Enterprises, the Option Notices refer only to DNC, DOM, and Domain Apps.  (Faia and Decossas evidently sold Vodun to David Vinterella, an attorney who worked with Faia, in 2012.  Trial Tr. vol. 2, 71:11-15.  No testimony was offered to explain why the Option Notices did not refer to VMS.)
[33] Motion to Reopen Chapter 11 Proceeding to Enforce Settlement Agreement (Case Doc. No. 667).
[34] During the course of the trial, the Court sometimes used "the Ladies" as shorthand when referring to Vivian Cahill and Sandra Gardner or Vivian Cahill and the Gardner Estate.

Solares and Gardner released in the Settlement Agreement.[35]  In support of this count, the plaintiffs allege that  Solares and Gardner were and remained at all relevant times the true holders of the rights to exercise the Options.[36]  In response, the defendants assert that the Options were intended to and did give Vivian and Sandra rights to exercise the Options for their own benefit.[37]

By agreement of the parties to this proceeding,[38] the Court entered an order bifurcating the trial to permit the Court to

> hold a trial to determine through appropriate final judgment the following: whether any of the interests or rights claimed or possessed by Defendants Vivian Solares Cahill ("Ms. Cahill") and Sandra F. Gardner ("Ms. Gardner") and/or the Estate of Sandra F. Gardner, through Michael H. Gardner, its Personal Representative (the "Estate"), with respect to (a) [DOM]; (b) [DNC]; and (c) [Domain Apps] (collectively, the "Three Companies"), if any, were granted to, owned by, possessed by or otherwise conveyed to Ms. Cahill, Ms. Gardner and/or the Estate as mere nominees or in some similar capacity for the benefit of Solares and/or Gardner, (individually) and, therefore, the interests or rights claimed by Ms. Cahill, Ms. Gardner and/or the Estate in the Three Companies are governed by the Order Granting Motion to Approve Compromise (Doc. 573) entered by the Bankruptcy Court on February 11, 2021 (Doc. No. 576) and the terms and provisions of the Settlement Agreement and Release approved by that order (the "Nominee Issues"). Necessarily implicit in the Court's Trial on the Nominee Issue[s] is a determination by the Court of whether any rights or interests were granted to Ms. Cahill or Ms. Gardner (or her estate) at all.[39]

The Court conducted a five-day trial on the Nominee Issues, involving numerous exhibits and testimony of nine witnesses, after which both sides submitted proposed findings of fact and

---

[35] Amended Complaint (Doc. No. 30) and Notice of Filing More Definite Statement (Doc. No. 147). The Options the Nominee Defendants seek to exercise are separate and distinct from options in TPI that Solares and Gardner did give, or were to give each other, as part of the original three-phase plan that called for both men's expatriating and then owning and operating their businesses together outside the United States.
[36] *Id.*
[37] Ex. 163.
[38] A motion to bifurcate the trial (Doc. No. 157) was initially filed by the Nominee Defendants and subsequently joined by TPI (Doc. No. 159).  At a hearing on the motion, counsel for plaintiffs Faia, Decossas, DNC, DOM, and Domain Apps, and counsel for defendants Solares and Gardner announced their agreement to the requested relief as provided in the Agreed Order. *See* Transcript of July 15, 2022, Hearing (Doc. No. 199).
[39] Agreed Order Granting Motion to Bifurcate Trial and Stay Discovery (Doc. No. 192).

conclusions of law at the Court's request.  *See* Plaintiffs' Findings of Fact, Conclusions of Law, and Memorandum Opinion on the Nominee Issue (the "Plaintiffs' Post-Trial Brief") and Defendants' Proposed Findings of Fact and Conclusion of Law on the Nominee Phase Issues and Accompanying Timeline (the "Defendants' Post-Trial Brief").[40]

### *Jurisdiction*

The first proposed conclusion of law in the Defendants' Post-Trial Brief is that the Court lacks subject matter jurisdiction to adjudicate the Nominee Issues.[41]  The Court rejects this proposed conclusion.  Not only is it incorrect, but also it conflicts with representations previously made by the defendants.

A bankruptcy court's jurisdiction generally extends to cases under title 11, as well as any and all proceedings arising under title 11 or arising in or related to a case under title 11, pursuant to a referral of such cases and proceedings from the district court.[42]  Further, as the Supreme Court stated in *Travelers Indemnity Company v. Bailey,* a bankruptcy court "plainly [has] jurisdiction to interpret and enforce its own prior orders."[43]  In *Travelers,* the Court expressly acknowledged a bankruptcy court's jurisdiction to enter an order clarifying an order the court had entered more than two decades earlier approving a settlement, which order had been incorporated by reference into an order confirming a chapter 11 plan.  The settlement and confirmation orders enjoined certain actions against the debtor and Travelers Indemnity Company for asbestos claims.  Years later, when claimants began filing state court actions against Travelers that appeared to violate the

---

[40] Doc. Nos. 439 and 438, respectively
[41] Defendants Post-Trial Brief (Doc. No. 438).
[42] 28 U.S.C. §§ 157 and 1334.
[43] *Travelers Indemnity Co. v. Bailey,* 557 U.S. 137, 151 (2009).  *See also Local Loan Co. v. Hunt,* 292 U.S. 234, 239 (1934) ("That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled.  And this, irrespective of whether the court would have jurisdiction if the proceeding were an original one.") (citations omitted).

injunction, Travelers sought injunctive relief from the bankruptcy court concerning those actions.[44] On the issue of whether the bankruptcy court had subject-matter jurisdiction to enter an order clarifying its prior orders for the benefit of non-debtor litigants, the Court stated, "[t]he answer here is easy: as the Second Circuit Court recognized and respondents do not dispute, the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders. . . . What is more, when the bankruptcy court issued [the prior orders], it expressly retained jurisdiction to enforce its injunction."[45]

Similarly, the Eleventh Circuit in *Kachkar v. Bank of America Corporation*, after describing a bankruptcy court's statutory-based jurisdiction under 11 U.S.C. § 1334(b), cited *Travelers* for the proposition that bankruptcy courts additionally have jurisdiction to interpret and enforce their own prior orders.[46] In that case, the court considered a bankruptcy court's jurisdiction over a civil proceeding removed to the bankruptcy court post-confirmation. The court determined that the bankruptcy court had statutory "related to" jurisdiction to consider the removed action, citing a Third Circuit opinion in which the court stated that in considering a bankruptcy court's post-confirmation jurisdiction, "the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction of the matter."[47] Although the *Kachkar* court also cited the Third Circuit opinion for the proposition that "[m]atters that affect the interpretation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus,"[48] it concluded that because the matters raised in the complaint in the removed action "were based on and intertwined with various

---

[44] *Travelers,* 557 U.S. at 151.

[45] *Id.*

[46] *Kachkar v. Bank of America Corp. (In re Kachkar),* 769 Fed. App'x 673, 679 (11th Cir. 2019).

[47] *Id.* at 679 (citing *J. Louis Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l Inc.),* 372 F.3d 154, 166-67 (3d Cir. 2004)).

[48] *Id.*

bankruptcy court orders," there was "a sufficient nexus to the plan or proceeding" for the bankruptcy court to exercise "related to" jurisdiction.[49]  Further, in upholding the bankruptcy court's denial of abstention, the *Kachkar* court noted that "[e]ven assuming, arguendo, that the matter was not a core proceeding, the bankruptcy court had a basis for jurisdiction independent from § 1334. . . .  That is, the bankruptcy court retained jurisdiction to interpret and enforce its own prior orders, and here, several bankruptcy court orders were at the center of the dispute."[50]

In the present proceeding, the Nominee Issues arose based on allegations that the Nominee Defendants' efforts to exercise the Options violated the Court-approved Settlement Agreement, which the Court's confirmation order recognizes, together with the equity agreement between Solares and Gardner, as the "lynchpin for the global resolution of all disputes between the parties thereto, respectively," and identifies these two agreements and TPI's chapter 11 plan ("TPI's Plan") as "collectively [providing] for the means of execution of this plan." [51]  The Settlement Agreement was also the key factor in the Court's decision to approve TPI's motion to convert the chapter 7 case to one under chapter 11.  Absent the global resolution, conversion was not on the table, period.[52]

Enforcement of the Settlement Agreement, as requested under Count III of the complaint, thus falls squarely within the Court's "related to" jurisdiction.  The agreement in dispute is closely intertwined with orders of this Court — including the order approving the Settlement Agreement, the order converting TPI's bankruptcy to a case under chapter 11, and the order confirming TPI's

---

[49] *Id.*

[50] *Id.* at 679-80.  *See also Walter v. Celotex Corp. (In re Hillsborough Holdings Corp.),* 197 B.R. 366, 370 (Bankr. M.D. Fla. 1996) (court retained jurisdiction to enforce settlement agreement that served as the "linchpin and heart" of the debtor's confirmed chapter 11 plan) (citations omitted); *Harper v. Heather Hills Amenities, LLC,* 648 B.R. 740, 744 (M.D. Fla. 2023) (affirming bankruptcy court's post-confirmation jurisdiction to interpret and enforce its own orders) (citations omitted).

[51] Order Confirming Plan (Case Doc. No. 651).

[52] Ex. 145. Transcript of  February 25, 2021, Hearing (Case Doc. No. 703).

Plan — over which orders the Court retains jurisdiction as a matter of law to interpret and enforce. "Related to" jurisdiction exists here, too, inasmuch as this proceeding affects the execution or administration of the plan because the Settlement Agreement sought to be enforced was the single most critical means of implementing TPI's Plan.  Further, the order approving the Settlement Agreement expressly states that "[t]his Court retains jurisdiction . . . to interpret and enforce the terms of the Settlement Agreement."[53]  And the order confirming TPI's Plan states that "this Court shall retain jurisdiction to the fullest extent permitted by law to interpret and enforce the provision of this Plan, this Order, and all other matters as set forth in the plan."[54]

Counsel for the Nominee Defendants appear to acknowledge such jurisdiction in their motion to bifurcate the trial in this proceeding to first resolve the Nominee Issues.  Arguing in favor of bifurcation, their motion states that "if a court with subject matter jurisdiction determines with finality that Ms. Cahill and Ms. Gardner were not the nominees of Solares and Gardner in 2011 and 2012, no further trial involving the Nominee Defendants would be necessary because the [Settlement] Agreement unambiguously does not govern them or the Options."[55]  Further, at the hearing on the Motion to Bifurcate, counsel for the Nominee Defendants represented to the Court that his clients agreed "in the agreed order [granting the motion to bifurcate], that the Court can enter a final order and that . . . by making that agreement, we are not waiving our rights with

---

[53] Order Granting Motion to Approve Compromise (Case Doc. No. 576).  *See also* Ex. 146 ("The Settling Parties agree that the United States Bankruptcy Court for the Middle District of Florida (Tampa Division) shall have continuing jurisdiction to enforce the terms of this Agreement and the parties expressly consent to the exercise of personal jurisdiction over them for that limited purpose to the fullest extent permitted by law.").  Although Vivian Cahill and Sandra Gardner were not signatories to the Settlement Agreement, because this proceeding involves an adjudication of their rights, even had they not been named as initial defendants, they were subject to joinder as indispensable parties. *See* Rule 7019, Fed. R. Bankr. P. (incorporating Rule 19, Fed. R. Civ. P.).

[54] Order Confirming Chapter Plan (Case Doc. No. 651).

[55] Motion of Defendants Vivian Solares Cahill and Michael Gardner, as the Personal Representative for the Estate of Sandra F. Gardner, to Bifurcate Trial and to Stay Discovery (Doc. No. 157).

respect to the Court's ability to enter final orders with respect to any other matters with respect to this case."[56]  Moreover, the order granting bifurcation, to which all defendants to this proceeding agreed, expressly states that nothing in the order shall alter the rights of the parties "to consent or oppose the entry of final orders or judgments by the Bankruptcy Court, *except that the Parties consent to entry of final orders or judgment by the Bankruptcy Court regarding the Nominee Issues*."[57]  Therefore, even if, for argument's sake, this Court otherwise lacked jurisdiction to enter a final judgment at the conclusion of the trial on the Nominee Issues, all defendants have consented to this Court's jurisdiction for such purpose.[58]

In the Defendants' Post-Trial Brief, the Nominee Defendants seem to suggest that choice of law provisions in the Options that evidence consent to the jurisdiction of the State of Louisiana supplant this Court's subject matter jurisdiction. Thus, they appear to conflate subject matter jurisdiction with venue, the latter of which concerns where a dispute should be resolved.  With subject matter jurisdiction firmly anchored in this Court, venue is proper here under the applicable federal statute.[59]

### *Choice of Law*

The Settlement Agreement that the plaintiffs seek to enforce states that the parties thereto agree that this Court has continuing jurisdiction to enforce the terms of the agreement and that the agreement "shall be governed by, and construed and enforced in accordance with, the laws of the

---

[56] Transcript of July 15, 2022, Hearing at 11 (Doc. No. 199).

[57] Agreed Order to Bifurcate Trial and to Stay Discovery (Doc. No. 192) (emphasis added).

[58] *See Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S. 665, 671 (2015) (bankruptcy courts may hear and determine a non-core proceeding and enter final judgment with the parties' consent).

[59] *See* 28 U.S.C. § 1409 (governing proper venue of proceedings arising under title 11 or arising in or related to cases under title 11 as generally being in the district court in which such case is pending, with exceptions for certain trustee actions, not applicable here). *See also* 28 U.S.C. § 1408 (providing for venue of a case under title 11 as the district in which the debtor's domicile, residence, principal place of business, or principal assets in the United States have been located for a specified amount of time).

State of Florida, without regard to conflict of law principles."[60]    The Nominee Defendants,

however, were not signatories to the Settlement Agreement.    They argue that Louisiana law should

apply because the Options state that the parties "consent to the jurisdiction of the State of

Louisiana, Parish of Jefferson, for resolution of any dispute regarding this agreement or the transfer

intended herein and the enforcement of this contract under the laws of the State of Louisiana."  So,

which state's law should the Court apply to determine if the Settlement Agreement — which is

subject to construction and enforcement under Florida law, was violated by the exercise (or

attempted exercise) of the Options — which evidence the drafters' intent that construction and

enforcement fall under Louisiana law?

As it turns out, it does not matter.  Both Florida and Louisiana law recognize the basic legal

concept that drives the analysis for resolving this dispute:  that courts may look behind whose

name appears on a title or other legal document to determine the beneficial owner.[61]  Florida courts

considering beneficial ownership seek to determine if a party holding title is the true owner or a

mere nominee or alter ego of the owner.[62]    Louisiana courts also sometimes use the term

---

[60] Ex. 146.

[61] *See, e.g., Feldheim v. Plaquemines Oil and Dev. Co.,* 282 So. 2d 469, 477 n.3 (La. 1973) (noting state statute distinguishing "legal title" from "equitable or beneficial ownership interest"); *Gurley v. Mills* (*In re Gurley)*, Case No. 6:95-ap-00293, Doc. 109 (Bankr. M.D. Fla. 1997) ("Bare legal title is not determinative of all property rights; Florida law recognizes that *true ownership* or an ownership interest *may rest with a party who is not the titleholder of record.*") (emphasis added), *aff'd,* Case No. 98-cv-01169-GKS, Doc. 13 (M.D. Fla. Sept. 3, 1999), *aff'd,* Case No. 99-13416 (11th Cir. Sept. 20, 2000).

[62] *See, e.g., Biscayne Realty Ins. Co. v. Ostend Realty Co.,* 148 So. 560, 566 (Fla. 1993) (where company was used to purchase and hold title to real property, court treated judgment debt of the company as that of its owner by looking "beyond the mere form of the corporate entity to the person who was the sole beneficiary of its activities, directed and managed the transactions, used the corporate name at his pleasure, incurred financial obligations in its name, conveyed to himself corporate lands when he so desired, received all money paid to the corporation by way of consideration in its transactions, . . . [such that] the act in the corporate name was his act, and his act that of the corporation."). *See also Gurley* (11th Cir. Sept. 20, 2000) (unpublished) ("The concept of equitable ownership has long been recognized by the Florida courts."  And Florida courts have "enforced the principle of equitable ownership where, as here, bare legal title cannot be said to confer ownership.") (citations omitted).

"nominee" in this context.[63]   At other times, however, courts in Louisiana use "nominee" to refer to a "mandatory" or someone designated to act for another as his representative in a limited capacity, as in an agent-principal relationship.[64]   Count III does not allege that Vivian or Sandra agreed to act as agents of Solares and Gardner in connection with the Options.   Therefore, for purposes of this opinion, the Court uses "nominee" to mean "one who holds bare legal title for the benefit of others,"[65] the legal definition that better characterizes the issue tried.   Further, Louisiana courts seek to identify which party enjoys beneficial ownership when considering if a particular transaction is a "simulation" or a "sham" transaction that intentionally misrepresents the real parties' true intent.[66]   Thus, however labeled, Florida and Louisiana law substantively recognize that a person holding legal title is not necessarily the true or beneficial owner.[67]   Consequently, the Court need not choose between applying Florida or Louisiana law.[68]   The outcome is the same regardless of which state's law the Court looks to.

---

[63] *See, e.g., Walker v. Supreme Indus. Life Ins. Co.,* 169 So. 2d 245, 247 (La. App. 4 Cir. 1964) (where plaintiff alleged shares of stock were put in the name of another only for convenience, court described "the crux of the plaintiff's case" as "his contention that [the named stockholder] was not *the true owner* of the shares involved herein, but rather *a mere nominee.*") (emphasis added).

[64] *U.S. v. Lewis,* 2014 WL 4638849, *8 (W.D. La. Sept. 12, 2014) ("nominee" is sometimes used to signify an agent or trustee; "[i]t has no connotation . . . other than that of acting for another, in representation of another, or as the grantee of another.").

[65] *Nominee,* Black's Law Dictionary (10th ed. 2014) (". . . A party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others.").

[66] *See,* La. Civ. Code, Art. 2025 ("A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties.")

[67] *See Davis v. Parker,* 145 F. 3d 359, 1998 WL 307585, *9-11 (5th Cir. 1998) (unpublished) (where evidence supported jury's finding that written agreement to transfer stock did not, by mutual agreement, reflect the parties' true intent in light of an oral agreement to transfer stock back to original stockholder at a later date, court determined written agreement was a relative simulation and, thus, a nullity, "*[i]rrespective of the name by which this 'rose' is called.*") (emphasis added).  This opinion uses the terms "true owner" and "beneficial owner" interchangeably.

[68] The plaintiffs argue that because the Options state only that the parties "consent" to the application of Louisiana law, they are not bound by the same.  *See* Plaintiffs' Post-Trial Brief and cases cited therein. However, because the Court finds that it matters not which state's law applies, it need not address this argument.  Even so, the Court cites supporting decisional law from both jurisdictions in this opinion.

### *Burden and Standard of Proof*

The issue before the Court is whether the Options, only unsigned drafts of which were offered into evidence,[69] granted to Vivian and Sandra the right to exercise the Options for their own benefit or, instead, if Solares and Gardner remained at all relevant times the true holders of such rights.   On this issue, the parties agree that the plaintiffs bear the burden of proof.[70]  Further, the plaintiffs contend, correctly, that should they meet this burden, then the burden would shift under Louisiana law governing simulations back to the Nominee Defendants to prove that they were, in fact, the intended beneficiaries of the Options.[71]  This same shifting of the burden — back to the parties in whose name title or other legal right is held to prove they are the true owners — also occurs under federal common law.[72]  The Court agrees that the plaintiffs bear the burden of proving that Vivian and Sandra were mere nominees of Solares, Vivian's brother, and Gardner, Sandra's son, with respect to the Options, and that if the plaintiffs meet that burden, the burden shifts to the Nominee Defendants to prove the contrary — that they are the true holders of the rights to exercise the Options.

---

[69] Ex. 23 and 68.

[70] In their respective post-trial briefs, the plaintiffs assert that the defendants must prove that the Options were finalized and executed, and the defendants assert that the plaintiffs must prove that this did not occur. (Doc. Nos. 439 and 438, respectively).  However, this opinion deals with Count III of the complaint, which relies upon allegations that the Nominee Defendants' attempt to exercise the Options violates the Settlement Agreement because the rights to exercise them were held by Solares and Gardner and were released as part of that agreement.  This issue does not require proof of whether the Options were finalized and signed.

[71] Plaintiffs' Post-Trial Brief (citing *Moorman v. Adams,* 827 So. 2d 471, 480-81 (La. App. 2 Cir. 2002).

[72] *See, e.g., Simpson v. U.S.,* 1989 WL 73212, *5 (M.D. Fla. April 6, 1989) (in challenge to IRS levy, if the IRS meets its burden of proving a nexus between the taxpayer and the property levied upon, burden shifts back to the plaintiff, who "retains the final obligation of persuading the court that the levy should be overturned" because the plaintiff has superior rights in the property) (citing *Morris v. U.S.,* 813 F.2d 343, 345 (11th Cir. 1987)).

Regarding the standard of proof, under both Florida and Louisiana law, plaintiffs bringing civil actions typically must prove their case by a preponderance of the evidence.[73]  The parties do not appear to dispute application of this standard, which the Nominee Defendants state means "more likely than not," and plaintiffs identify as "the greater weight of the evidence," both being accurate and equivalent descriptions.[74]  At least within the Eleventh Circuit, however, courts applying a nominee theory in cases involving federal tax liens have used a "substantial evidence" standard,[75] which has been described in this context as "considerably more than a preponderance but less than clear and convincing."[76]  As discussed more fully below, the Court ultimately finds that the plaintiffs proved their case by clear and convincing evidence, meaning that their contentions are "highly probable or reasonably certain,"[77] which exceeds both the preponderance-of-the-evidence and substantial-evidence standards.

To the extent the Court relies on circumstantial evidence in deciding if the parties have met their respective burdens,[78] the Court may rely on reasonable inferences to reach its findings of fact

---

[73] *S. Fla. Water Mgmt. Dist. v. RLI Live Oak, LLC,* 139 So. 3d 869, 872 (Fla. 2014) (a preponderance of the evidence is the standard burden of proof in civil cases).  *Accord Lasha v. Olin Corp.,* 625 So. 2d 1002, 1005 (La. 1993).

[74] *Gross v. Lyons,* 763 So. 2d 276, 281 n.1 (Fla. 2000); *Coltharp v. Hearin Tank Lines, Inc.,*118 So. 2d 881, 888 (La. 1960).

[75] *See, e.g., Morris v. U.S.,* 813 F.2d 343, 345 (11th Cir. 1987) (where government seeks to levy against property held by a third party to satisfy debt of delinquent taxpayer, which is an "extraordinary action," government must put forth "substantial evidence").  *Accord Tato Int'l Corp. v. Dept. of Treasury,* 1989 WL 104789, *4 (S.D. Fla. July 5, 1989).

[76] *Nelson v. U.S.,* 821 F. Supp. 1496, 1501 (M.D. Ga. 1993).

[77] Eleventh Circuit Pattern Jury Instructions (Civil Cases) 1.2 (2022): 1.2 Burden of Proof – Clear and Convincing Evidence.  Sometimes a party has the burden of proving a claim or defense by clear and convincing evidence. This is a higher standard of proof than proof by a preponderance of the evidence. It means the evidence must persuade you that the claim or defense is highly probable or reasonably certain. www.ca11.uscourts.gov/sites/default/files/courtdocs/clk/FormCivilPatternJuryInstructionsRevise dMAR2022.pdf. *See also, Colorado v. New Mexico,* 467 U.S. 310, 316 (1984) (clear and convincing means that the fact finder has an "abiding conviction" that the truth of the "factual contentions are (sic) 'highly probable.'").

[78] *See May v. A Parcel of Land,* 458 F. Supp. 2d 1324, 1336 (S.D. Ala. 2006) (where no direct evidence presented on whether true intent of taxpayer was to remain the beneficial owner of property allegedly given to his wife as a "gift," court turned to circumstantial evidence to assess intent); *Moorman v. Adams,* 827

18

and conclusions of law.[79]  "The standard for determining whether an inference is allowable is generally whether it is reasonable or whether it is one that reasonable and fair-minded men in the exercise of impartial judgment might draw from the evidence."[80]

### *Determination of Beneficial Ownership*

Aside from the fact that all four of the men involved in this proceeding are entangled in a web of their own making, and at different times have been alleged prey of the others' faction, a further irony exists.  After arguing for years that by the agreement of all four men, Faia and Decossas were, in effect, owners of the Three Companies in name only, with Solares and Gardner retaining beneficial ownership of the companies,[81]Solares and Gardner must now defend against an accusation by Faia and Decossas that — as part of the same scheme under which Faia and Solares purportedly became only nominal owners of the Three Companies — Vivian and Sandra were given rights to exercise the Options in name only, with Solares and Gardner retaining the beneficial rights in the Options.

Determinations of nominal[82] versus beneficial ownership frequently arise in federal court in the context of challenges to an IRS levy upon property for taxes due by someone other than the title holder of the property levied upon and challenges to government forfeitures of property used

---

So. 2d 471, 480 (La. App. 2 Cir. 2002) ("A simulation may be proven by indirect or circumstantial evidence since, by its inherent nature, a simulation often only admits of circumstantial proof."). *See also U.S. v. Planes,* 2019 WL 3024895, *9 (M.D. Fla July 11, 2019) (circumstantial evidence used to establish a fact by clear and convincing evidence).

[79] *Familienstiftung v. U.S.,* 643 F. Supp. 139, 147 (S.D. Fla. 1986). *See also Byers v. Gunn,* 82 So. 2d 723, 726 (Fla. 1955) (in Florida, when court relies on circumstantial evidence as a method of proof in a civil case, any reasonable inference deducible from such evidence that would authorize recovery must outweigh all contrary *reasonable* inferences) (emphasis added) (citations omitted); *Lacey v. La. Coco-Cola Bottling Co., Ltd.,* 452 So. 2d 162, 164 (La. 1984) (court in civil case may rely on circumstantial evidence that, taken as a whole, excludes "every other reasonable hypothesis with a fair amount of certainty;" this does not mean that it "must negate all other *possible* causes") (emphasis in original) (citations omitted).

[80] *Familienstiftung,* 643 F. Supp. at 147 (internal quotations omitted).

[81] Ex. 119 and 120.

[82] Nominal, as used in this opinion, means "in name only." *Nominal,* Black's Law Dictionary (10th ed. 2014) ("1. Existing in name only. . . .").

in the commission of a crime yet held in the name of someone other than the criminal defendant — both involving attempts to shield assets from the government.[83]  Federal courts in both Florida and Louisiana, applying federal common law to resolve these types of ownership issues, consider similar factors including, but not limited to:  exercise of dominion and control over the subject asset, threat of collection activity (or similar motive to hide assets), a close relationship between the parties involved, payment of consideration or lack thereof, and payment of expenses to maintain the asset.

For example, in *United States v. Dornbrock,* a District Court in Florida considered whether a taxpayer owned a three-bedroom condominium, title to which was held by a corporation formed by the taxpayer solely to hold title.[84]  There, the court concluded that the corporation was a nominee of the taxpayer, and the condominium was, therefore, taxable as property of the taxpayer after considering, among other things: (1) the taxpayer identified himself as the owner of the condominium and was its sole occupant, (2) the condominium was placed in the name of the corporation in anticipation of collection activity, (3) a close relationship existed between the taxpayer and the corporation, (4) the taxpayer never paid the corporation any rent for use of the condominium, and (5) the taxpayer paid the condominium expenses (mortgage, property taxes,

---

[83] *See, e.g., U.S. v. Dornbrock,* 2008 WL 769065, * 6 (S.D. Fla. Jan. 17, 2008), *aff'd,* 309 Fed. App'x 359 (11th Cir. 2009) (when levying upon property titled to a person or entity other than the delinquent taxpayer, government bears the burden of proving taxpayer is the beneficial owner of the property).  Because Florida law has no "bright line" test for determining nominee, alter ego, and similar issues, federal courts applying Florida law on such issues typically look to federal common law for guidance. *Id.* at *5.  *See also U.S. v. Norman,* 1999 WL 959254, at *1, *4 (E.D. La. Oct. 19, 1999) (party challenging forfeiture of a criminal's assets bears the burden of proving an ownership interest in the assets greater than that of the criminal; "[a] failure to look beyond bare title would foster manipulation of nominal ownership to frustrate the intent of the [applicable'] statute.") (internal quotations omitted).

[84] *Dornbrock,* 2008 WL 769065.

insurance) directly or was the source of the funds for payment of expenses.[85]   In describing the nominee theory in this context, the court stated that "[f]ocusing on the relationship between the taxpayer and the property, the [nominee] theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner."[86]

In *U.S. v. Norman,* a District Court in Louisiana considered whether a vehicle driven during the commission of a drug-related crime was subject to forfeiture despite the contention by the registered owner of the vehicle, who was the father of the criminal defendant, that the vehicle belonged to him.[87]   In that case, the court concluded that the father failed to show an ownership interest in the vehicle superior to that of his son, the defendant, after determining: (1) the son drove the vehicle most often, (2) the son negotiated and paid most, if not all, of the purchase price for the vehicle, (3) the son paid expenses to maintain the vehicle, and (4) according to testimony of a police officer, drug dealers sometimes put assets in family members' names to protect assets from forfeiture, suggesting an ulterior motive for putting title to the vehicle in the father's name.[88]

---

[85] *Id.* at *5 (citations omitted). *See also Shades Ridge Holding, Co. v. United States,*[85] 888 F.2d 725, 728-29 (11th Cir. 1989) (district court applied correct legal principles in determining IRS could levy on corporation's assets on account of delinquent taxes of taxpayer after considering: (1) control taxpayer exercised over corporation and its assets, (2) use of corporate funds to pay taxpayer's personal expenses, and (3) family relationship between taxpayer and corporate officers).

[86] *Dornbrock,* 2008 WL 769065, at *4 (citations omitted). Given that the purposes of the three-phase plan as devised by the four men included avoiding or evading tax liability, nominee decisions in the tax context provide particularly relevant guidance.  *See also Gurley* (M.D. Fla. Sept. 3, 1999) (affirming bankruptcy court's conclusion that husband retained equitable ownership of approximately $17 million in assets wife claims he transferred to her where close family relationship existed, husband retained complete control of the property, wife paid no consideration, and husband continued to manage of all wife's account, investments, and interests).

[87] *U.S. v. Norman,* 1999 WL 959254.

[88] *Id.  See also U.S. v. One 1978 Piper Navajo PA-31 Aircraft,* 748 F.2d 316, 319 (5th Cir. 1984) (bare legal title by one who does not exercise dominion and control over the property is insufficient to establish ownership).

Determinations of nominal versus beneficial ownership are not, however, limited to cases dealing with tax liability and government forfeitures. Courts have applied a nominee theory in cases involving resulting trusts, rights of judgment creditors, an exception to the dangerous instrumentality doctrine, a "special equity" exception to record title in a dissolution of marriage, certain shareholder actions, and actions by chapter 7 trustees to identify and recover property of the estate.[89]

Further, as stated earlier, under Louisiana law, determinations of nominal versus beneficial ownership may also arise when parties to an agreement are alleged to have intended a different result from that stated in the agreement, in which instance the agreement may be set aside as a simulation or a sham transaction.[90] Louisiana courts undertaking such determination often look to factors similar to those that courts look to when undertaking a nominee analysis. These include but are not limited to an ulterior motive for entering into the agreement (such as threat of liability), continued use of and control over the property that is the subject of the agreement, a close relationship between the parties, adequacy of consideration, and payment of expenses. In *Williams v. Smith,* for example, a Louisiana state court considered a deed that, on its face, transferred a 13-

---

[89] *See Angueira v. Trujillo (In re Trujillo)*, 607 B.R. 734, 738-740 (Bankr. S.D. Fla. 2019) and cases cited therein. *See also Gurley* (Bankr. M.D. Fla. Aug. 15, 1997) (determining equitable ownership for purposes of 11 U.S.C. § 541, court considered: (1) close family relationship between the debtor and the titleholder, (2) debtor's continuing exercise of control and dominion over the asset, and (3) debtor's holding himself out publicly as the owner).

[90] In the Defendants' Post-Trial Brief, the Nominee Defendants urge the Court to recognize Vivian as a party to the Options, find that the Options express her true intent, and conclude, therefore, that the Options cannot be simulations. The fact that the Options identify Vivian as the proposed purchaser does not, however, necessarily make her a party to the Options. A "party" is "[s]omeone who takes part in a transaction." *Party,* Black's Law Dictionary (10th ed 2014). And, as explained later in this opinion, only the self-serving trial testimony of Vivian and the testimony of a childhood friend of hers was offered to prove that she signed the Options. No evidence was offered to show that Vivian drafted, negotiated, or otherwise played any part in the Options. And only self-serving testimony, which was heavily outweighed by contrary evidence, was offered to try to prove she was the intended beneficiary of rights granted in the Options — either as a party, as the recipient of donations from Faia and Decossas, or in some other capacity. The actual parties to the Options were the four men who created them.

acre tract of land from one man to his brother.[91]  In finding that the deed purporting to make such

transfer was "a sham and a simulation," the court considered the following facts: (1) beneficial use

and control of the property by the grantor who continued to run cattle on it, (2) the deed was given

shortly before the grantor filed for and subsequently obtained a legal separation from his wife, (3)

the recited consideration was $250, while at the time of the transfer the property was worth over

$5,000, and (4) inconsistent testimony as to how the property had previously passed from certain

family members to others.[92]  Similarly, in a case dealing specifically with stock certificates,

*Hartnett v. LGD Properties, Inc.*, another Louisiana state court looked to decisions dealing with

"simulated transfers" and concluded that a couple in whose names stock certificates of a newly

created company were issued were not the true owners of the stock.[93]  In reaching this conclusion,

the court considered: (1) the true intent of the parties was to protect real property transferred to the

company by another couple from that other couple's creditors, (2) the other couple testified that it

was understood between the parties that the stock would be transferred to them once their financial

problems were solved, (3) the other couple provided all monies paid to transfer the real property

from themselves to the company, (4) the other couple managed the property, and (5) the couple in

whose names the stock was issued provided no cash to the company.[94]

To determine which parties — Vivian and Sandra or, instead, Solares and Gardner — were

the true holders of the rights to exercise the Options, the Court will apply to the facts of this case

factors similar to those discussed in the decisions referenced above.  In a nominee analysis,

although no one factor is determinative, the most critical factor is "who exercises active and

---

[91] *Williams v. Smith,* 340 So. 2d 401 (La. App. 2 Cir. 1987).

[92] *Id.* at 402-03.

[93] *Hartnett v. LGD Properties, Inc.*, 767 So. 2d 88 (La. App. 4 Cir. 2000).

[94] *Id.* at 94.  *See also, Lockhart v. Dickey,* 108 So. 483, 484 (La. 1926) (transaction causing stock certificates to be issued in another person's name while marital separation suit was pending deemed "a simulation pure and simple" where court found it was done solely to hide assets).

substantial control over the property."[95]   When analyzing alleged simulations, on the other hand,

courts focus primarily on intent.[96]   This Court considers the following six factors as the best

framework for resolving the present dispute: (1) anticipation of collection activity, (2) intent of the

drafters, (3) beneficial use and control, (4) close/family relationship, (5) adequacy of

consideration, and (6) payment of expenses.   This litany of factors and the following application

of them to the facts of this case do not follow the order of their significance.   Rather, they are

discussed in an order that roughly tracks the timeline of relevant events.

### 1. Anticipation of Collection Activity

Overwhelming, undisputed evidence presented at trial demonstrates that at time the

Options were drafted, Solares and Gardner were facing threats of massive financial losses both

from lawsuits and an IRS audit.   Demonstrating the risk of losses from litigation, liability for

alleged serial cybersquatting in an action by Verizon that was pending in March of 2010 was

estimated to be as high as $66 million.[97]   The Verizon suit came on the heels of a settlement with

Dell Computers over trademark infringement, and there was concern that many more companies

might sue on similar grounds.[98]   With respect to the IRS, TPI was notified in May of 2010 that the

IRS was conducting an international audit.[99]   As testified by Faia — apparently referring to a

restructuring of TPI that began in late 2005 and involved setting up new Cayman Island companies

under the TPI umbrella,[100] "when they did the transfer from the American entities to the Cayman

---

[95] *Daer Holdings, Inc. v. Menchise (In re Steffen),* 2014 WL 11428827, *8 (M.D. Fla. 2014), *aff'd,* 611 Fed. App'x 677 (11th Cir. 2015).

[96] *See, e.g., Davis v. Parker,* 1998 WL 307585, at *6-10 (in dispute involving an agreement to transfer stock, court focused primarily on intent of the parties, as evidenced by motivation for the transaction, lack of consideration, as well as contemporaneous and subsequent conversations between the parties).

[97] Trial Tr. vol. 2, 17:14-23.

[98] Trial Tr. vol. 5, 252:4-22.

[99] Trial Tr. vol. 2, 12:9-13.

[100] Trial Tr. vol. 5, 33:14-19 and 35:8-23.

entities, there were different valuations that had to be done, and the IRS gets to interpret whether or not the valuations provided are accurate."[101]  Faia testified that he thinks the local valuation was about $30 million and the IRS valuation was about $120 million.[102] Solares testified that, although he thought it was ridiculous, the initial valuation by the IRS was a $140 million adjustment to taxable income.[103]

### 2.  Intent of the Drafters (including Discussion of Credibility of Key Witnesses)

Several witnesses testified that, around the time that the three-phase plan was devised and executed, Solares and Gardner were concerned about the threats of substantial financial losses as just described, and that the plan was designed to protect their assets from those threats.[104]  The end game, at least from Solares and Gardner's perspective, was always for them to retain ownership and control of their assets, while avoiding the outward appearance to creditors and the government that they still owned them.[105]  According to Solares, "[a]t no time were my and Mr. Gardner's beneficial interests in the Debtor, its assets and operations, to be altered or destroyed."[106]  When asked at trial to explain this prior statement, Solares testified that "the restructuring plan was sold to me as a legal means to protect our assets and that everything would be, like we said, the three-phase plan: me and Michael, we transfer, and then it ends up me and Michael at the end. That was the original plan."[107]

As for the Options being part of the Protection Documents, the parties generally agree that they were essentially intended as a backup to the powers of attorney and other Protection

---

[101] Trial Tr. vo1. 3, 46:9-24.
[102] Trial Tr. vol. 3, 46:16-20.
[103] Trial Tr. vol. 2, 22:20-22.
[104] Ex. 230, at 80-82. Trial Tr. vol. 2, 34:18-22. Trial Tr. vol. 3, 46:9-24. Trial Tr. vol. 5, 264:2-6, 21-25.
[105] Ex. 119 and 120.
[106] Trial Tr. vol. 5, 124:24-125:3.
[107] Trial Tr. vol. 4, 125:7-11. *See also* Ex. 229, at ¶¶ 25 and 26. Trial Tr. vol. 2, 51:24-52:7.

Documents, and they provided a means to force an immediate transfer of ownership in the Three

Companies upon payment of the consideration stated therein.[108]  At trial, they disagreed, however,

as to which parties were the intended beneficiaries of the right to demand such transfer.

Numerous recorded conversations and electronic written communications made at or near

the time the Options were drafted and the asset transfers at issue occurred (from 2010 through

2012)[109] amply demonstrate that the Options were created for the benefit of Solares and Gardner,

not Vivian and Sandra.  The record is rife with contemporaneous discussions about inserting names

of family members in the Options as mere place holders for later use by Solares and Gardner to

take back their assets.  That the apparent mistrust among the men caused one or more of them to

record their discussions is another twist of irony in that the recordings provide the most compelling

evidence imaginable. Who better to tell the tale in real time than the four main players themselves,

who were so wary of deception that they participated in recorded conversations to prevent any

later manufactured retelling of what transpired?  Below are excerpts from transcripts of recorded

discussions in which Solares and Gardner participated during the run up to the implementation of

each phase of the three-part plan. (For ease of reference, the Court has set out in bold type the

remarks most obviously pertinent to the nominee issue.)

<u>December 17, 2010</u>

GREG FAIA: So that they can immediately implement a restraining order to prevent any, um,
decisions being made which appear to be outside of the agreement that's been signed.

SIGMUND SOLARES: Uhm-uhm.

---

[108] Trial Tr. vol. 5, 37:1-6 and 38:19-21. Trial Tr. vol. 3, 90:17-20.  The Options each include an agreement
between the purchaser and seller "to an immediate issuance of a temporary restraining order . . . to enforce
each and every right granted to Purchaser herein."  Ex. 23 and 68.

[109] With respect to the timing of these conversations relative to the asset transfers at issue, the parties do not
dispute that the transfer of assets from TPI to DNC and DOM occurred on August 25, 2011, and that the
transfer of assets from TPI to Domain Apps occurred sometime in May of 2012.  *See, e.g.,* Ex. 28.

GREG FAIA: Okay? So, and I'm -- **I'm saying your nominee because since you would've already expatriated, the better thing would be for your sister** or -- I'm using your sister –

SIGMUND SOLARES: Right.

GREG FAIA: -- but whoever. **Your nominee comes in and takes your spot** and your nominee comes in and immediately seizes and stops everything. Okay? . . .

GREG FAIA: You see what I mean? So there's **no cost to you to exercise it**. **It just means [“]I don't like the game. It's not what you said. Put it back.[”]** . . .[110]

GREG FAIA: Is because the one higher risk -- not higher risk, but the one that I thought of on an immediate basis was - and this is for stage one and stage two - is if something happens to Michael, um, basically, **how would you be back in control?** Okay? **Since you are already gone.**

SIGMUND SOLARES: Uhm-uhm.

GREG FAIA: Right? **The answer is through the option with your nominee you would put the person who you control** and then we continue to stage two anyway. You with me?

SIGMUND SOLARES: Uhm-uhm.

GREG FAIA: And then **stage two you would end up in control at the end of the day anyway**. Do you see what I mean?

SIGMUND SOLARES: Right.[111]

GREG FAIA: Okay? So, if there's something else you're unhappy about it, you know, **there'll be enough control for you to be able to -- because, remember, for you to come back, or your nominee** –

SIGMUND SOLARES: Uhm-uhm. . . .[112]

<u>August 24, 2011</u>

SIGMUND SOLARES: Ah, the other thing, the next thing is, on document L it has on irrevocable stock power for value received the undersigned hereby sell, assign and transfer to blank, a person of full age of majority domiciled in the parish of Jefferson, State of Louisiana. So **whose name would be plugged in that line** that lives in Jefferson Parish?

GREG FAIA: **Whoever you want.**

SIGMUND SOLARES: Oh, okay. **So like I would put my sister and then Michael would put somebody else** or what, what do you mean?

---

[110] Ex. 230, at 5-6 (quotation marks added based on a reasonable inference that Faia was indicating what Solares could say if Solares felt that his interests were in jeopardy).
[111] Ex. 230, at 8.
[112] Ex. 230, at 10-11.

GREG FAIA: Yeah.

SIGMUND SOLARES: **Somebody -- just so that there's somebody in Louisiana**.

GREG FAIA: It doesn't have to be Jefferson, but it should be Louisiana.

SIGMUND SOLARES: Okay.

GREG FAIA: But what y'all can do is this, the reason is, it's done in blank, five years from now I -- I -- I'm making something up. Who knows who you want to put in the blank.

SIGMUND SOLARES: Okay. **So we just put somebody in the blank.** Okay.

GREG FAIA: **You put somebody in the blank and that's it.**

SIGMUND SOLARES: **We can plug someone into the blank whenever.** All right. Then –

GREG FAIA: It's like the stock certificate itself is signed in blank. Because, remember, what should happen in theory is, if you exercise that right you would put that person in that stock power.

SIGMUND SOLARES: Uhm-uhm.

GREG FAIA: And that, that interest would get transferred to them. **Because you're not going to want to transfer to you as a foreign person. You with me?**

SIGMUND SOLARES: Right

GREG FAIA: **So that would be, you know, I — you know, like you said, your sister, whatever, right?** And **it would be your temporary solution** if you were -- if you were doing something as a temporary solution. You know?

SIGMUND SOLARES: Right.

GREG FAIA: That's just saying worst case scenario.

SIGMUND SOLARES: Okay.

GREG FAIA: You know? Where you didn't come to us and say, oh, look, we're – we want to change it, you know, where, you know, you found out that Butch had, um, I don't know, raped your mom and stole 10 million dollars. So you -- you want to do something immediate. You know.

GREG FAIA: So, but **the main thing is, do you and Michael have the ability, and the club to make us change things.**

SIGMUND SOLARES: Right. . . .[113]

---

[113] Ex. 230, at 34-38.

August 25, 2011

MR. SOLARES: Yeah, and, I mean, **as far as, you know, the option -- the, the, the backup option** agreement thing, is that what you were talking about? Yeah, I mean, because really –

MR. FAIA: Correct.

MR. SOLARES: —- I was thinking that, you know, we didn't even **-- I mean, she doesn't even need to know about it necessarily, you know? Her or, you know, Michael's mother, you know? It would be something that me and Michael would know about and, uh, uh —**

MR. FAIA: I haven't [inaudible] anybody –

MR. SOLARES: Oh, no. No. No. I mean, I'm not saying —

MR. FAIA: -- other than y'all. . . .

MR. FAIA: **So it's created, and it's there for you, you know?**

MR. SOLARES: Okay.

MR. FAIA: I mean, you know, whatcha could even do – hold on a second. From the standpoint of them signing it –

MR. SOLARES: Right. That's what –

MR. FAIA: — **You don't even need to get them to sign it.**

MR. SOLARES: Uh-huh.

MR. FAIA: You have our signatures on it. Then —

MR. SOLARES: Right.

GREG FAIA: — **if you want to use it, you get them to sign.** You know what I mean?

MR. SOLARES: Exactly.

MR. FAIA: **If you don't even want them to know it's out there.** You know what I mean?

MR. SOLARES: Right. Right.

MR. FAIA: **You could always pull that too.**

MR. SOLARES: Right. Right. . . .[114]

MICHAEL: [Inaudible]. Okay, Sig, you're going to have to pick.

SIG: Okay.

MICHAEL: **Or you leave it blank.**

---

[114] Ex. 230, at 40-41.

GREG: **Choose your weapon.**

SIG: You know, why is it that it's never easy? No, [inaudible]. . . .

SIG: **I mean, what we can do is put Vivian Solares. I mean, that's my mother's name and my sister's name. So, either of one them — well, I mean, I guess if we put Vivian Cahill, that wouldn't work.**

MICHAEL: That's a good reason.

GREG: It seems mercurial to me.

MICHAEL: Yeah. I need to name my s — my next son Michael, so I could take advan — that was clever of your mom. She was pretty clever. . . .

GREG: All right. **Well, we'll put Vivian Solares.**

SIG: **Sounds good.**

GREG: That's a much better idea. . . .

SIG: **We're not even going to tell anybody else about this, this even existing.** So basically, Dave, what would happen is you're going to hold on to this for now or we can put — **or you can put it in a sealed envelope before giving it to my sister and, you know, she's not to open it. It's hold, you know, holding that for me. You know.** Does that make sense?

MICHAEL: **And you trust her for that, the sealed envelope?** A lot of people have a hard time wondering what's in the sealed envelope. . . .[115]

SIG: **So on the option to purchase stock, we'll probably —- so, we'll change it from Vivian Cahill to Vivian Solares.** . . .

SIG: And then we'll probably want to put, uh, a social security number line and leave it blank, of course. **That way, when it's plugged in, it shows which Vivian Solares it is based on the social security number.** Does that make sense, Dave? . . .

SIG: **Yeah, and we changed the Cahill to Solares, and then that way -- it's there, flexibility. I mean, it'll never be used, but it sits there.** . . .[116]

April 10, 2012

SIGMUND SOLARES: We had the whole plan. That was **the reason I expatriated was to protect my assets and Michael's assets**, you know, and why we don't want to – . . .

SIGMUND SOLARES: Right. I know. But your job is to protect, you know, both of our assets, and **this is both of our assets.** . . .[117]

---

[115] Ex.230, at 46-49.
[116] Ex. 230, at 51-52.
[117] Ex. 230, at 73-76.

MICHAEL GARDNER: Why, like, usually, you keep on using the word, "asset protection."

SIGMUND SOLARES: Well, I mean, the one thing is when we look at what assets Verizon wants to find out about, they want to know who owned which assets from the date of the lawsuit until the present. And the reason is because once the date of the lawsuit... You know, that's the stuff that they can get clawed back. So, anything that's in TPI, the day after the lawsuit, is subject to being seized by yet a new... You know, in the event there's a new law-... You know, in the event there's a new lawsuit.  And so, for me, our original plan was **we go through all these hoops so that we protect the assets. I mean, you know, it's your assets, it's my assets, and we want to protect them.**[118]

SIGMUND SOLARES: I mean, **I have the options I have.** I mean, I'm not sure –

GREG FAIA: You do. . . .

GREG FAIA: You just have it. You do have the right. **Regrettably, because you ex -- you're an expat you have to exercise it through a third person, you know? That's the only problem.** . . .[119]

April 18, 2012

VERNON DECOSSAS: -- **you got to exercise the options** –

SIGMUND SOLARES: Right.

VERNON DECOSSAS: -- at that point.

SIGMUND SOLARES: Right.

VERNON DECOSSAS: **That's your recourse at the end of the day.** And I hope it never comes to that, but, you know, if, if that's what happens, it's what happens. And, I mean, that, **that's what you hold.**

SIGMUND SOLARES: Uhm-uhm.

VERNON DECOSSAS: So, . . . you hold something. I'm glad you hold something. . . .[120]

May 9, 2012

SIGMUND SOLARES: Yeah. And I mean, the big things are just stuff like, let's say, either I sell to Michael or Michael sells to me, then we're going to need to have some other -- something else in escrow. The other thing is, at some point **we're going to exercise options** and then it would just be my stock that would be deposited. So, I mean, at some point you guys – . . .[121]

SIGMUND SOLARES: – was just **when we do the options**, I want to make sure we use a long enough time frame so that, you know, whether it's 10 years -- I would say -- I'd rather go

---

[118] Ex. 230, at 78.
[119] Ex. 230, at 80-82.
[120] Ex. 230, at 58-59.
[121] Ex. 230, at 63-64.

ridiculously long just so that we don't have to worry about changing things. You know, we might change stuff in – . . .[122]

<u>May 12, 2012</u>

SIGMUND SOLARES: Right. And so, well yeah, well, **right now I have an option and Michael has an option**. So, you know –

GREG FAIA: Oh, right, right, right. . . .[123]

As for written communications, several emails were produced at trial wherein Solares and Gardner, at or around the time that the Options were being drafted and allegedly executed, express concern about their ability to recover their assets that were being transferred out of TPI into the Three Companies.  For example, in an email Solares apparently sent to himself with notes he had made, he writes

> 7. Power of attorney. . . . Also need power of attorney from DNC holdings, etc. in order to take back the company.  . . . 8. Probably will also need an option and right of first refusal agreement that would allow you [referring to himself] and Gardner to purchase Greg and Butch's interest in DNC Holdings along with the power of attorneys.[124]

Written communications also demonstrate that the use of family members' names in the Options was not done to give these family members the right to exercise the Options for their own benefit; they support the plaintiffs' position that the Options were for the benefit of Solares and Gardner. In an email dated April 19, 2012, for example, Solares writes to Decossas "on the options me and Michael [Gardner] could pay the prices to you, greg [Faia], and then substitute names. So Michael for Michael, I would have my sisters, etc."[125]

Notably, no evidence was presented to suggest that either Vivian or Sandra played any role in drafting the Options.  Neither participated in the recorded conversations about the Options that

---

[122] Ex. 230, at 71.
[123] Ex. 230, at 61.
[124] Ex. 43.
[125] Ex. 61, at 27.

were played during the trial.  And none of the written communications offered into evidence discusses an intent on anyone's part to give Vivian and Sandra options so that they could each acquire for themselves 50 percent of stock of the Three Companies.[126]  There were  however, two brief email exchanges offered into evidence involving Vivian, one the day before and one the day of the alleged execution of the Option for DNC and DOM.  These email exchanges went like this:

> On 8/24/2011 9:27 AM, Sig wrote:
> I might need you to meet up with Vinterella, Butch, et cetera, to handle some paperwork tomorrow. So if you could plan for some flexibility on Thursday, that would be ideal. Sorry for the late notice.

> On 8/24/2011 at 12:15 PM, Vivian wrote:
> No problem. I can be available.  I just pick up [. . .] for 2:20 and that is it.

> On 8/24/2011 at 11:21 AM, Sig wrote:
> Okay. I would say there is a 50 percent chance I will need you.  I will let you know. Either way, I will definitely need you for something in about a week or so. I will keep you posted.

> On 8/25/2011 at 9:01 AM, Vivian wrote:
> any update on today?

> On 8/25/2011 at 8:28 AM, Sig wrote:
> really today is not super important, but Butch might call you later and have you swing by Greg's office.  You would not need to be there longer than, say, 15 minutes.[127]

Aside from these emails, no evidence in the form of a written or recorded communication was offered to support Vivian's story that she actually went to Faia's office on August 25, 2011, and signed an Option for DNC and DOM, or if she did, that she understood what she was signing. These email exchanges between Vivian and Solares actually undermine her testimony as to what occurred on August 25 because they give no indication whatsoever that she is being asked to come

---

[126] There is, however, a recorded oral statement by Solares indicating that the stock options could be used if Solares or Gardner died. Ex. 230, at 19-21.  The possibility that the Options were intended for estate planning purposes is discussed *infra* with respect to consideration.
[127] Ex. 27.

to Faia's office to sign a document of significant import that gives her the right to purchase a half

interest in companies worth millions of dollars.

Vivian testified at trial that not only did she sign the Options but that she signed them "in

her own right[s]" (presumably meaning that she understood the rights to exercise the Options were

being granted to her for her personal benefit).   On the second day of her testimony, she robotically

repeated this same phrase seven times.  When asked about the various draft options, the colloquy

with her attorney went like this:

> Q: How did you appear in the final version of this document?
> A: In my own rights.
> Q: How did you execute the final version of the document?
> A: In my own rights." [128]
> . . .
> Q: How did you appear in the final version of this document?
> A: In my own rights.
> Q: How did you execute the final version of the document?
> A: In my own rights." [129]
> . . .
> Q: How did you appear in the final version of this document?
> A: In my own right.
> Q: How did you execute the final version of the document?
> A: In my own right." [130]

And shortly after the last of these three exchanges, Vivian again testified with regard to the

Options that "[t]hey were all in my name in my own rights."[131]  Thus, her testimony on this point

came across as coached, rote, mechanical, and just not credible.  In the end, the only other evidence

offered by the Nominee Defendants to prove that the Options were drafted with the intent to give

the Nominee Defendants the right to exercise them — and thereby together take full ownership of

the Three Companies for themselves — were self-serving statements made during the trial.  This

---

[128] Trial Tr. vol. 4, 192:2-7.
[129] Trial Tr. vol. 4, 194:10-15.
[130] Trial Tr. vol. 4, 196:20-25.
[131] Trial Tr. vol. 4, 214:5.

testimony was strongly outweighed by Solares and Gardner's communications and conduct — beginning from their first recorded conversations about the Options — and by the conduct and lack thereof of the Nominee Defendants up to the time counsel was engaged to represent them in their efforts to exercise the Options.

The evidence most damaging to the defendants on the issue of who the Options were intended to benefit were Solares and Gardner's own statements, including recorded conversations, email statements, sworn statements, and statements made in verified pleadings, all coming straight from the horses' mouths.   To the extent these two testified at trial that the Options were intended to benefit Vivian and Sandra — a full 180-degree turn from prior contrary statements they had made over the course of the past ten years as reflected in the record of this proceeding, the Court gives no weight to such testimony.   In the choice given by the classic trial cliché "are they lying now, or were they lying then?," the Court accepts as true the prior statements over the current ones. In order for a fact witness to testify under oath and take a position completely contrary to a position he previously took in the form of one or more sworn statements (including some in this very Court in the case and in the Joint Proceeding, which arguably trigger judicial estoppel to proffer a different version), this Court concludes that for the latter version of facts to be capable of acceptance, it is incumbent upon such witness to provide a plausible explanation of why the witness previously testified that way, how and when he came to learn that the prior testimony was not accurate, and what the witness did to correct the prior statement.   This was not done here. Instead, Solares and Gardner's efforts to change the narrative came across as nothing more than opportunistic attempts to rewrite the history of the Options in order to receive indirectly that which they failed previously to receive and can no longer receive directly due to the release provision in the Settlement Agreement.

As for Vivian's testimony, it seemed that she too prefers revisionist history with respect to the Options.  The Court got the impression from Vivian that she wanted to believe her own tale, but that she did not.  In addition to appearing coached, Vivian showed no emotional reaction when confronted with the recordings and the facts about actions taken by Solares and Gardner to devalue the Three Companies (for example, by attempting to have them completely subsumed into TPI via substantive consolidation).  If Vivian genuinely believed that the Options were always for her benefit and Sandra's, then when she learned — if not prior to the trial then during it — that her own brother had gone to great lengths to deprive her of that benefit (including pledging her alleged right in the Option for DNC as collateral along the way),[132] then certainly she would express some emotional reaction.  Yet, her voice remained flat while she testified.  Further, she displayed not even a slight spark of indignation in her voice, body language, or facial expression at the notion that her brother's adversaries were, in this very proceeding, trying to take away something that she owns.  The only time she flashed a bit of indignation was when she criticized Gardner for not expatriating.[133]

With respect to the testimony of Faia and Decossas, the positions they took at trial were consistent with the multitude of recorded and written communications made contemporaneously with the 2011 and 2012 transactions involving the Options. Their story never changed.  Faia and Decossas' testimony was clear and appeared genuine and unrehearsed.   In contrast, the storyline told by Solares and Gardner has completely flip-flopped.  And these two appeared flustered and/or rehearsed at times when confronted with their own prior contradictory statements, many of which

---

[132] *See* evidence cited *infra* note 164.
[133] Trial Tr. vol. 1, 216:4-6.

were played or read into the record during the trial.[134]  Thus, based on the degree of consistency with prior contemporaneous communications and these four men's respective demeanors while testifying, the Court finds the account of Faia and Decossas considerably more believable than that of Solares and Gardner.

Another witness, David Vinterella, an attorney who worked for the Debtor and then for Faia during the period when the Options were drafted and allegedly executed, testified at trial that he saw Vivian sign the Options and that he notarized them.[135]  Vinterella, who is also a long-time friend of Solares and Vivian,[136] is the only witness to support Vivian's narrative on this issue.[137] Whether or not his testimony is accurate, the signing of the Options is significant only to the extent that it could minimally support an inference favoring Vivian's position that she and Sandra were the intended beneficiaries of the Options.  But in light of the overwhelming evidence to the contrary, even if Vivian signed the Options, this fact cannot carry the day for the Nominee Defendants.

Interestingly, on the issue of intent, in the Nominee Defendants' Answer and Affirmative Defenses to the Amended Complaint and More Definite Statement[138] and in a complaint they filed in U.S. District Court for the Eastern District of Louisiana in March of 2022[139] — which complaint

---

[134] For example, with respect to a recorded telephone conversation between Gardner, Faia, and Solares in March of 2020 (Ex. 118, as corrected at Doc. No. 414), when Gardner was asked to explain why he had talked about "getting the assets back" and never once mentioned recovering anything for his mother Sandra, he repeated six times that he was "emotional" or "very emotional" and, therefore, was not thinking straight not in his right mind, or thinking only of himself.  Trial Tr. vol. 4, 65:3-68-19.

[135] Trial Tr. vol. 5, 179:11-15 (regarding Option in DNC and DOM). Trial Tr. vol. 5, 206:5-22 (regarding Option in Domain Apps).

[136] Trial Tr. vol. 1, 257:18-24.

[137] During trial, plaintiffs' counsel confronted Mr. Vinterella with a 2020 deposition in which he initially stated he did not recall separate closings occurring on August 25, 2011, or remember options in favor of Vivian or Sandra, although he testified that his recollection was subsequently refreshed. Trial Tr. vol. 5, 225:9-19. Trial Tr. vol. 5, 237:10-238:5.

[138] Ex. 163.

[139] Ex. 159.

includes allegations nearly identical to allegations in the Joint Proceeding[140] — the Nominee Defendants assert that the Options were drafted for their benefit as "estate planning" documents.[141] Yet, in this trial, the term "estate planning" was used only in connection with Sandra's having assisted in preparing financial statements for Gardner.[142]  There was, however, testimony by Solares that he wanted the Options created as a "backup solution" in case he or Gardner died.[143] Similarly, Gardner testified at trial that options in favor of his mother and Solares' sister could be used if someone died.[144]  Gardner's credibility on this issue suffers because if the Options were truly created for estate planning purposes, why would he give rights to acquire the Three Companies to his mother, who in 2010 was already seriously ill, rather than to his wife and children?[145]

Estate planning is generally understood to provide for the transfer of assets upon one's death or incapacity. But the Options are not conditioned upon the death or incapacity of Solares and Gardner.  Moreover, both men are still very much alive and neither appears to be incapacitated. Thus, even if, for argument's sake, the Court were to find that the Options were drafted so as to give Vivian and Sandra the right to exercise the Options upon the death or incapacity of Solares and Gardner, respectively, no present right would exist for Vivian or Sandra to exercise the Options.

---

[140] Robert Elgidely, the attorney engaged by the Trustee to draft the complaint in the Joint Proceeding, described this 2022 Louisiana federal court filing by the Nominee Defendants as "[i]t's like they had our Complaint in Word and they just added additional parties as Plaintiffs or Putative Plaintiffs. This is nearly identical allegations to the Amended Complaint [in the Joint Proceeding] that you marked as an exhibit." Trial Tr. vol. 1, 157:7-15.

[141] Ex. 159.

[142] *See infra* at pp. 40-41.

[143] Trial Tr. vol. 5, 37:1-8.  *See also* Ex. 230, at 19-21. However, elsewhere Solares testified that the stock options were a "backup" because everything was one-sided in favor of Faia and Decossas. Trial Tr. vol. 5, 38:19-21.

[144] Trial Tr. vol. 4, 103:1-22.

[145] *See* Ex. 120, at 22 ("Toward the end of 2010, Gardner's mother was dealing with a serious illness and had a poor prognosis").  *See also* Trial Tr. vol. 4, 129:12-18.

In any event, far more credible evidence established that the Options were created so that Solares and Gardner could use them to take immediate ownership of the Three Companies upon payment of the purchase prices stated in the Options if Faia and Decossas failed to operate the companies for the benefit of Solares and Gardner, as purportedly agreed.[146]    If such failure occurred, Solares and Gardner could, presumably, either somehow substitute their own names on the Options as the purchasers or instead enlist Vivian and Sandra (or some other family members named as purchasers in the Options) to become the new nominal owners of the companies for the benefit of Solares and Gardner — the latter of which appears to be their chosen ploy.  So, unless and until a double-cross by Faia and Decossas occurred, there was no need to inform Vivian and Sandra of these potential plans.  According to Decossas, Solares had another reason to name his sister as the party capable of exercising the Options with respect to DNC and DOM.  Having become a non-U.S. citizen, Decossas explained that Solares could not legally own shares of DNC and DOM because these companies were set up as S corporations and non-U.S. citizens cannot own shares in an S corporation.[147]

It remains unclear why Solares would have recruited Vivian to sign the Options back in August of 2011 and May of 2012 if he did not intend to have her exercise them, or at least not unless and until Faia and Decossas pulled a double-cross.  Assuming, purely for argument's sake, that he did ask her to sign these documents and that they had already been signed by Faia and Decossas, a fair inference is that he may have done so only to ensure that Faia and Decossas could

---

[146] Ex. 119 and 120.  Ex. 230, at 34-38.  *See also supra* pp. 42-43 (discussing exercise of control over the Options by Solares and Gardner, which discussion also reveals further evidence on the issue of intent) (citing Ex. 120, 125, and 141).

[147] Trial Tr. vol. 2, 64:4-12.  *See also* 26 U.S.C. § 1361(b)(1)(C) (corporation ineligible for S corporation status if it has a nonresident alien as a shareholder); 26 C.F.R. § 1.872.1-2 ("The term nonresident alien means an individual whose residence is not within the United States, and who is not a citizen of the United States.").

not later back out of the deal.  And it is also conceivable that Solares asked Vivian to sign the Options without her understanding the import of the rights they ostensibly gave to her.

Regardless of the manner in which Solares and Gardner ultimately planned to use the Options, the evidence, taken as a whole, demonstrates a high degree of probability or reasonable certainty that the Options were intended to serve as part of what Solares and Gardner considered a fail-safe plan to enable them to retain beneficial ownership of the assets that were being transferred out of TPI into The Three Companies.  Simply put, the Court finds that the Options were never intended to give Vivian and Sandra the right to purchase the Three Companies for their own benefit.

### 3.    *Beneficial Use and Control (and More on Credibility)*

Because no executed Options were produced at trial, the Court's consideration of which persons exercised dominion and control over the Options focuses not on who may have physically possessed the final documents, if any such documents exist.  Rather, the Court looks to which persons conducted themselves as — meaning held themselves out as — the holders of the rights stated in the Options.  So, which persons' outward manifestations demonstrated beneficial use and control of the Options?  The evidence presented at trial reveals that between the time Vivian alleges that she signed the Options and the day Guardian Law was engaged to send the Option Notices on behalf of the Nominee Defendants, only Solares and Gardner ever spoke or acted as if they held the rights to exercise the Options. Vivian and Sandra never spoke or acted as if they did.

Vivian's inaction between the alleged signing of the Options in 2011 and 2012 (which signing the Court does not imply here actually occurred) until the engagement of Guardian Law in 2021, speaks far louder than these two bookends of events.  By Vivian's own account:

- She never asked anyone to provide her a copy of the Options, not even when she went to Faia's office in 2014 to retrieve papers for Solares or, even more significantly, after Faia and Decossas terminated her (and Sandra's) employment sometime that same year.[148]

- She never asked anyone for any type of accounting or other information about the financial status of the Three Companies.[149]

- She never discussed the Options with her accountant.[150]

- She is not sure if she discussed the Options with her former husband, even though she testified that he was currently living with her.[151]  She thinks she might have disclosed it to him in an interspousal agreement during their divorce.[152]  (This document, if existent, was not offered into evidence.  It would have been corroborative of Vivian's belief.)

- She never discussed the Options with any third party in connection with her separation or divorce or any other action in Louisiana.[153]

- She never discussed the Options with Faia or even Sandra.[154]

- She discussed the Options with Solares briefly throughout the years, maybe once a year. However, she testified during the first day of trial that she never really discussed the Options with him in any substantive way until February or March of 2021.[155]

- She made no financial investment in the Three Companies.[156]

- She never attempted to exercise the Options prior to 2021.[157]

Vivian testified that she did not exercise the Options prior to 2021 because she heard that

the Three Companies "were not doing good."[158]  But that was not true in 2011 and 2012 when she

---

[148] Trial Tr. vol. 1, 191:5-16. Trial Tr. vol. 1, 217:1-7.  Trial Tr. vol. 1, 218:14-22. Trial Tr. vol. 1, 221:24-222:20. Trial Tr. vol.1, 223:21-224:25. Trial Tr. vol.1, 186:16-187:8..
[149] Trial Tr. vol. 1, 191:1-16.
[150] Trial Tr. vol. 1, 193:8-15. Trial Tr. vol. 4, 222:14-19.
[151] Trial Tr. vol. 1, 272:21-273:2.
[152] *Id. See also* Trial Tr. vol. 1, 195:6-196:5.
[153] Trial Tr. vol. 1, 196:6-10.
[154] Trial Tr. vol. 1, 218:8-13. Trial Tr. vol. 1, 178:19-21.
[155] Trial Tr. vol. 1, 203:1-24.
[156] Trial Tr. vol. 4, 222:2-7.
[157] Trial Tr. vol. 1, 195:2-5.
[158] Trial Tr. vol. 1, 186:13-187:3.  *See also* Trial Tr. vol. 1, 206:19-25.

allegedly signed the Options.[159]  And no explanation was offered as to why, after Solares learned

that the Three Companies were, in fact, profitable — which would have been sometime before he

filed the 2017 Louisiana Action[160] — he did not encourage Vivian to exercise the Options then.

Instead, he filed that action on his own behalf.

Furthermore, with respect to the engagement of Guardian Law, although the retainer

agreement dated July 20, 2021, was signed by the Nominee Defendants, they gave Solares "full

and unconditional decision-making authority" regarding that representation.[161]

As for Sandra, there is also no evidence that she took any of the actions that Vivian failed

to take, as just described.  Even more telling is the fact that Sandra actually assisted in preparing

at least four personal accounting statements for Gardner between 2013 and 2016 that clearly

identify the rights conveyed by the Options as assets of Gardner.[162]

Solares and Gardner, on the other hand, during this same ten-year period, took myriad

actions evidencing an understanding that the Options were theirs and allowed them to control the

fate of the Three Companies.  For example:

- Between 2011 and 2016, they presided over the board meetings of the Three Companies
and were treated as their owners.[163]

- In an escrow agreement dated May 16, 2012, Solares agreed to "deposit with the Escrow
Agent Solares' option contract to purchase 50% of the Company [DNC Holdings, Inc.]," which
deposit was to be made in connection with a planned "earn-out" agreement with Gardner to
purchase Solares' interest in a company called VooDoo.[164]  (Essentially, Solares pledged his
Option as collateral to secure his performance due to Gardner.)

---

[159] Gardner testified that in 2011, the valuation of DNC was probably between $12 million and $15 million.
Trial Tr. vol. 4, 100:3-7.
[160] Ex. 119.
[161] Ex. 152.
[162] Trial Tr. vol. 4, 158:2-164:5.  Ex. 82 and 99.
[163] Trial Tr. vol. 2, 141:14-17.
[164] Trial Tr. vol. 4, 124:20-126:2. Trial Tr. vol. 2, 67:4-13. Ex. 69.

- Decossas testified that Solares sent hundreds of emails regarding the financial status of Solares' business interests, including inquiries about the Three Companies.[165]

- Meanwhile, Gardner complained about lack of financial information from Faia and Decossas.[166]

- In 2013, Solares and Gardner each made capital contributions of $500,000 to Domain Apps.[167]

- Gardner's interest in the Three Companies is reflected in four of his personal financial statements in the form of balance sheets dated between June of 2013 and September of 2016.[168] Those statements list the Three Companies as assets in which Gardner has an interest and show corresponding liabilities in the same amounts he would be expected to pay to exercise the Options. Below is an excerpt from his 2016 balance sheet:

|  | | |
|---|---|---|
| 1301 Ñ DNC Holdings, Inc. | 760,906.00 | |
| 1302 Ñ DNC Holdings, Inc. Liability | -760,906.00 | |
| 1303 Ñ Domain APPS, Inc. | 50,000.00 | |
| 1304 Ñ Domain Apps, LLC Liability | -50,000.00 | |
| 1306 Ñ DOM Holdings, Inc. | 25,000.00 | |
| 1307 Ñ DOM Holdings, Inc. Liability | -25,000.00[169] | |

- In the Louisiana Action, originally filed in February of 2017 and last amended as recently as March of 2020, Solares asserted in his complaint that the defendants in that case acted "to mislead him, defraud him, and steal his ownership interest in all assets owned by and all profits generated by [certain entities including DNC and Domain Apps]."[170]

- In the Louisiana Action, Gardner represented in a verified cross-claim and third party demand filed in April of 2020 that when the new companies were formed and put in the names of Faia and Decossas, Solares and Gardner "were supposed to be protected by Faia and Decossas and by option agreements that would allow them to purchase their interests back in the future."[171]

- In August of 2019, in his response to Gardner's second set of interrogatories, Solares identified DNC and Domain Apps as companies in which he had an ownership interest.[172]

- In the Joint Proceeding, initiated by the Trustee and in which Solares and Gardner joined as plaintiffs, the complaint states that with regard to transfers of assets to DNC and Domain Apps, "[a]t all relevant times, Faia and Decossas explained to and convinced Solares and Gardner that

---

[165] Trial Tr. vol. 2, 141:17-19.
[166] Trial Tr. vol. 4, 136:2-137:15.  Ex. 88.
[167] Trial Tr. vol. 2, 141:9-13.
[168] Trial Tr. vol. 4, 158:2-164:5. Ex. 82 and 99.
[169] Ex. 99.
[170] Ex. 100 and 119.
[171] Ex. 120.
[172] Ex. 113.

they would continue to be the *true beneficial owners* of the Debtor Entities' business operations, assets, and revenue, notwithstanding the Three-Phase Plan," and the complaint sought, among other things, substantive consolidation of the "Faia Decossas Entities," which included DNC and Domain Apps.[173]

- In an affidavit dated October 13, 2020, Gardner described the "protection documents which protected our rights to retake ownership of these assets" as including "stock certificates, stock powers, option agreements, powers of attorney, and executive resignation letters for all TPI's successor companies." [174] He explained that these were created "so that Solares and [Gardner] could get ownership of the companies on demand."[175] With specific reference to the transfer of assets to Domain Apps, Gardner stated in this affidavit that "an option in favor of Solares and [Gardner] allowed each of us to exercise an option to buy the shares of Domain Apps from Mr. Faia and Mr. Decossas for $1,250.00 each."[176]

- The proposed chapter 11 plan submitted by Solares and Gardner on October 14, 2020, in support of the motion to convert TPI's case from chapter 7 to chapter 11, stated that "[t]his Plan exercises those options [to take back assets and operations of TPI that were held temporarily by Faia and Decossas] by funding the option amounts, less a credit for monies taken by Messrs. Faia and Decossas in excess of their agreed upon annual salaries."[177]

- A joint motion for leave to file the Settlement Agreement under seal, signed by counsel for Solares and Gardner, stated in part that "[b]y sealing the Settlement Agreement, the Court will not prejudice any party in interest, nor will it cause harm to any third parties."[178]

Additionally, at a hearing conducted on January 28, 2021, on the motion to seal the Settlement Agreement, the Court asked — obviously out of due process concerns for any absent interest holder — "[s]o is there any affected party that would require a live hearing on the

---

[173] Ex. 125 (emphasis added).

[174] Ex. 141.

[175] *Id.*

[176] *Id.*

[177] Ex. 142.

[178] Ex. 143. In their response to the plaintiffs' Amended Complaint and More Definite Statement, the Nominee Defendants raise as an Affirmative Defense a provision in the Settlement Agreement whereby the parties acknowledge that "[a]ny prior representation or promise that is not expressly contained in this Agreement is not binding, enforceable, or material." An integration clause such as this, however, does not, prevent a party from asserting reliance on a statement unless that statement is specifically identified and disclaimed in the contract. *See Global Quest, LLC v. Horizon Yachts, Inc*., 849 Fed.3d 1022 (11th Cir. 2017) (applying *Oceanic Villas, Inc. v. Godson,* 4 So. 2d 689) (Fla. 1941), in which the Florida Supreme Court ruled that an integration clause did not prevent a challenge to a contract based on fraud in the inducement). Further, such a clause is not binding on the Court. Moreover, the Court doubts that an integration clause extends to prior representations made by a contracting party in court papers signed under the requirements of Fed. R. Bankr. 9011 or sworn to in a case against another contracting party.

compromise motion who is not represented here, given that you all are going to sign asking me to do it?"[179]    To which plaintiffs' counsel responded, "[e]very interested party, every equity — potential equity holder or anyone who's ever claimed equity, as well as every creditor in this case is represented and will be executing the document."[180]    The official transcript from that hearing reflects that counsel for Faia, Decossas, Solares, and Gardner all appeared.  Also in appearance was the Trustee and his counsel.  Further, the transcript reflects that Decossas, Solares, and Gardner were themselves listening to the hearing live.[181]    Yet even though all of those appearing at the hearing and those listening (with the possible exception of counsel for the United States Trustee, who also appeared) knew of the draft Options and knew whose names appeared in them, not one person thought it appropriate to inform the Court that the Nominee Defendants have — or even might have or think they have — a right to exercise the Options and thereby acquire for themselves ownership of the Three Companies.

The possibility that Solares and Gardner failed to speak up at the January 28, 2021, hearing because they had decided to pull a "gotcha" and back efforts by the Nominee Defendants to exercise the Options gains support from discussions between Solares and Gardner about a "Plan B."[182]    But if they failed to speak up then because they had not yet concocted "Plan B," they certainly shifted to the "gotcha" strategy by mid-May of 2021.  Conversations between these two at TPI board meetings held between May and August of 2021 reveal, without doubt, that the story currently being told by them and the Nominee Defendants about who controlled the Options was

---

[179] Ex. 145.

[180] *Id.*

[181] *Id.*

[182] Although the first discussion by Solares and Gardner of Plan B appears in a transcript of a conversation held on May 12, 2021, the record is silent on when the plan was initially hatched.  Thus, it could have been conceived prior to the January 28, 2021, hearing on the motion to seal the Settlement Agreement.  Plan B was, however, certainly discussed prior to the hearing on confirmation of TPI's chapter 11 plan on May 13, 2021.

weaved in furtherance of more deceit (and apparently amid continuing mistrust — given that Solares and Gardner's conversations were, again, recorded, perhaps to prevent one of them from later flipping the script). The following are excerpts of transcripts of the recordings admitted into evidence that allow this part of the tale to also come straight from the source (and again the Court uses bold type to emphasize the most pertinent portions):

5/12/2021

Solares: Hopefully, there's going to be cashflow there and we're gonna be able to grow the business and things like that. And that would be my preference, to say, okay. You know, but we also know that we're gonna have to pay attorneys another million, we know that we have to make money, we know that you know, **other stuff isn't gonna be you know, free you know, to do Plan B** and stuff like that, so- [183]

6/8/2021

Solares: But **with plan B, the plan would be, you know, the, to take control over the assets again, which at that point, um, the return of assets**, you know, that's a whole different ball of wax to look at. [184]

8/3/2021

Gardner: . . . **they're – you know – going to be mad about [your] sister and my mother's estate**. But that's fine. **That's just another fire. So I say we pour a bunch of gas on that fire** too and get the other fires going, . . . [185]

So, what exactly is Plan B? The ensuing explanations of Plan B by Solares at trial, as set forth below (excerpted from the trial transcript), were imprecise, dissembling, and not believable.

THE WITNESS: Plan B was putting out the book that I sent to the U.S. Trustees and to the federal -- to different agencies in an effort to -- there's the Victim Asset Recovery Fund. They try and recover assets for victims. And Plan B was taking the crimes, putting them out here and trying to get Greg and Butch responsible and prevent other victims from suffering the same fate that I suffered.
. . .

THE COURT: Okay. But you weren't satisfied, apparently, with the assets that were being transferred under the settlement agreement, so your Plan B was to augment that?

---

[183] Ex. 230, at 84.
[184] Ex. 230, at 86.
[185] Ex. 230, at 88.

THE WITNESS: Plan B was to put out the book to prevent other victims from getting -- from their being other victims in the future. And if we can get  -- if we could get the, you know, one of the money laundering or one of these organizations in the government that has the Victim Asset Recovery Program, then that's what we wanted to do.  There's also a mention on there of a million dollar payment. That was to Huber. So, that's completely separate. That had to do with what was already done.

THE COURT: In clip 37, you said that the plan would be to take control over the assets again. That's what you said Plan B was then. Doesn't that not --

THE WITNESS: I'm not sure.

THE COURT: -- sync with what you just told me that your Plan B was in clip 36?

THE WITNESS: I'm not sure which date, which clip --
. . .
THE COURT: June 8th --

THE WITNESS: June 8th. Well, we still didn't have control over the domain registrar and all that stuff which, in that case, we would have to come back to court by that point, because they weren't turning over assets that they were supposed to turn over. So while you have Plan B is anything that we can do. Early on, by March or so, I was saying -- you know, and I can't remember -- I don't know the dates of -

THE COURT: This is June 8th, 2021.

THE WITNESS: Yes. So early on the plan, you know, it was anything that we could do, which included first was the book, going to the feds and stuff like that. Then Michael was saying you wouldn't be happy because we're going to have to come back to this Court to get them to turn over the assets that they weren't turning over: the domain registrar, the accreditations --

THE COURT: Had there been a refusal to turn over the registrar as of June 8th, 2021?

In responding, Solares gave a nonresponsive, and thus telling, answer:

THE WITNESS: We still don't have the accreditations. We don't have hundreds of thousands of dollars --

THE COURT: Had they refused to do that which they had promised to do at a future date?

THE WITNESS: Yes.[186]

---

[186] Trial Tr. vol. 5, 141:19-144:21.

Solares' responses about Plan B were not credible for several reasons.  The May 12, 2021, discussion shows that Solares and Gardner expected that Plan B would not be "free."  It may be that Huber was owed $1 million, a past due debt — although there was no competent evidence to corroborate that explanation, but reporting to federal agencies is free.  And the discussion on June 8, 2021, clearly shows that Plan B was taking "control over the assets again."  In context, the two are plainly and unquestionably talking about themselves taking control of the assets, not Vivian and Sandra.  Solares' credibility suffered again when he tried to explain the statement as referring to assets that were due TPI under the Settlement Agreement.   That is because there was no need for a Plan B to enforce the Settlement Agreement given that there was no default by Faia and Decossas and their related entities as of June 8, 2021, as shown by Decossas, whose testimony the Court credits on this point.  When questioned by his attorney, Decossas testified (as excerpted from the trial transcript) as follows:

Q   As of June 8th, 2021, had you or Mr. Faia or anyone else with DNC Holdings expressed any position that you were no longer willing to comply with the terms of the transition services agreement?

A   No, we did not.

Q   Okay. To your understanding, were you in compliance with the transition services agreement as of June 8th of '21?

A   Yes, we were.[187]

Solares' testimony regarding Plan B is further suspect given that this Court had reserved jurisdiction to enforce all parties' compliance with the terms of the Settlement Agreement.  Thus, Plan B could not be understood to include a remedy — a motion to compel — that had already been contemplated by all, the Court included.  And given the contentiousness and distrust that the two sides exhibited in TPI's underlying bankruptcy case as well as in this proceeding, any

---

[187] Trial Tr. vol. 5, 304:8-19.

nontechnical default would assuredly have triggered an immediate motion to compel and possibly even a corresponding request for sanctions. The Court takes judicial notice of the main case docket which shows no such motion practice between the April 2021 closing of the Settlement Agreement and the June 8, 2021, discussion of Plan B.

No, the Court finds that Plan B was clearly to use revisionist history to paint a picture different from what was originally intended with the Options, that the beneficial owners were always Solares and Gardner: Plan B was for Solares and Gardner to argue, as they have in this proceeding, that their family members owned the Options all along, and, therefore, the rights thereunder could not have been released in the Settlement Agreement. But then, behind the scene, Solares and Gardner would nonetheless continue to exercise control over the Options through those family members. as they have since the Option Notices were served.

Further supporting the proposition that Solares and Gardner continued to exercise control over the Options is found in the Settlement Agreement.[188] In the agreement, the parties represented that: (1) the agreement settles the Louisiana Action, the Joint Proceeding, an administrative expense claim, proofs of claim, *"and all other claims, disputes, and controversies"* between Faia, Decossas, and certain entities owned by them including the Three Companies, on behalf of the foregoing as well as any and all of the foregoing's foreign or United States owners (whether shareholders, interest holders, or members), affiliates or subsidiaries (together, the "FD Entities") on the one hand, and Solares, Gardner, Gardner's wife Kathryn, and certain entities owed by them, on behalf of the foregoing as well as any and all of the foregoing's foreign or United States owners (whether shareholders, interest holders, or members), affiliates or subsidiaries (together, the "SG Entities"), and the Trustee on the other hand, and (2) that each party has "complete authority to

---

[188] Ex. 146.

execute and resolve the Parties' rights as they propose to accomplish herein."[189]   How could any reasonable, fair-minded person possibly understand that this representation was made by parties who knew of the Options and understood them to give the Nominee Defendants rights to take full ownership of the Three Companies?  Clever semantics aside, the reasonable inference is that one could not.

Also extending beyond the realm of reasonableness is an attempt to reconcile a genuine intent by Solares and Gardner for their close family members to possess the right to purchase the Three Companies, while these two men: (1) engaged in costly and protracted litigation in state court and in connection with this bankruptcy case that would, if successful, entitle them to all profits generated by the Three Companies, either directly or through the Debtor,[190] (2) through the Debtor, proposed a chapter 11 plan (proffered prior to the settlement) that relied on stripping the assets of the Three Companies and returning them to the Debtor,[191] and (3) entered into a Settlement Agreement that recognized Faia and Decossas as the owners of the Three Companies.[192]  Equally unbelievable is the idea that Vivian and Sandra could think the rights to exercise the Options belonged to them and yet take no action to stop or intervene in any of the above conduct.[193]

Further manifestation of beneficial ownership and control of the Options by Solares and Gardner is the agreement between The Silvey Law Firm and TPI, executed by Solares on behalf of TPI on July 28, 2021.  Pursuant to that agreement, the law firm represents TPI and Solares'

---

[189] *Id.* (emphasis added).
[190] Ex. 119, 120, and 125.
[191] Ex. 142.
[192] Ex. 146.
[193] *See* Ex. 101 (email from Solares to Vivian dated Feb. 23, 2017, advising her of the Louisiana Action). *See also* Ex. 107 (email from Sandra to Gardner dated Dec. 14, 2018, regarding the Louisiana Action, in which she states, "I DO NO WANT TO BE A WITNESS.").

purported "clients," the Nominee Defendants.[194]  The services to be provided included filing a

lawsuit on behalf of the Nominee Defendants related to exercise of the Options.[195] Yet, Solares is

named in that agreement as the sole decision-maker and TPI agreed to compensate the law firm

with a signing bonus of $5,000 and six monthly payments of $8,333, plus expenses, the payment

for which Solares "personally and unconditionally" guaranteed.[196]  On that same date, TPI wired

the firm $5,000.[197]  And in an email from Gardner to Solares dated August 14, 2021, Gardner says

"and Sig, remember this – YOU are in charge, this is your show."[198]

Based on the evidence as a whole, the Court is firmly convinced that conduct of Solares

and Gardner together with the conduct and lack thereof of Vivian and Sandra since the day the

Options were allegedly executed demonstrates that only Solares and Gardner considered

themselves and held themselves out as owning and controlling the rights purportedly granted in

the Options.

### 4.   Close Relationship

No dispute exists as to the close family relationship that existed between Solares and his

sister, Vivian, and between Gardner and his mother, Sandra.

### 5.   Adequacy of Consideration

With respect to whether Vivian or Sandra paid any consideration for allegedly being

granted the right to exercise the Options, the Nominee Defendants argue that any such failure is

irrelevant because Louisiana law does not require payment of consideration to obtain a purchase

option.[199]  That may be a valid argument were the Court deciding if the Options are enforceable

---

[194] Ex. 153.
[195] *Id.*
[196] *Id.*
[197] *Id.*
[198] Ex. 156.
[199] Defendants' Post-Trial Brief, at 70 (citing La. Civ. Code Ann. Art. 2620 and commentary thereto).

as against Faia and Decossas. Here, however, the Court looks to payment of consideration, or the adequacy of any consideration paid, to explain what might have motivated Solares and Gardner to permit Vivian and Sandra to obtain for themselves rights to acquire lucrative business interests that it took Solares and Gardner years to develop. It would have to have been something compelling. Alternatively, inasmuch as the Options identify Faia and Decossas, or businesses held in their names, as the proposed "sellers," what possible motive would *they* have to grant Vivian and Sandra the right to directly acquire the businesses identified in the Options? Receipt of consideration would be one motivation. Yet, no evidence of consideration given to anyone was presented to support motive.

At trial, Vivian testified that Solares gave her the Options in exchange for "sweat equity," a term that she used once during the trial and her counsel used three times in his opening statement.[200] Specifically, Vivian testified that Solares told her about the Options and wanted her to stop working her current job at a restaurant and work for DirectNic. "And that was the plan," she said, "that he was going to let me get these options based on the fact that if I went back to work for DirectNic."[201] She further testified that at that time she was leaving a restaurant job where she earned about $30,000 a year and that she earned about $40,000 after going back to work with Solares, serving primarily in customer service and administrative support roles.[202] Nothing in the record suggests that Vivian would not have gone back to work with Solares but for the allegedly promised Options, especially when the job change involved a pay increase. As for Gardner's allegedly giving the Options to his mother, he too suggested that it was done to reward her for helping him manage his business interests.[203] No evidence was presented on what Sandra, who

---

[200] Trial Tr. vol. 1, 193:19-25. Trial Tr. vol.1, 27:1-6, 30:6-8.  Trial Tr. vol. 1, 31:12-16.
[201] Trial Tr. vol. 1, 186:7-12.
[202] Trial Tr. vol. 1, 194:1-9
[203] Trial Tr. vol. 4, 94:14-23.

served primarily as a bookkeeper,[204] earned. And although Gardner testified that Sandra offered some business-related advice when he and Solares first began expanding their business interests and that she made a few investments over the years in Gardner's businesses, her investments were relatively small in amount.[205] Regardless of the value Vivian and Sandra may have contributed to Solares and Gardner's businesses, it is impossible, in this Court's view, for any reasonable-minded person to infer that their contributions merited rights to acquire multi-million dollar business interests or that Solares and Gardner would willingly walk away from the same. The difference in value is simply far too disproportionate for this scenario to be believed as true. And again, if Faia and Decossas were the parties actually responsible for granting Vivian and Sandra rights in the Options, no credible evidence was presented to suggest, nor can the Court fathom, any reason why they would do so.[206] Based on the evidence presented, the factor concerning the adequacy consideration weighs heavily in the plaintiffs' favor.[207]

---

[204] Trial Tr. vol. 4, 94:24-95:10.

[205] Trial Tr. vol. 4, 97:6-17.

[206] Solares testified that "Butch [Decossas] said he loves my sister to death and would be anything for her . . . he said the same about Ms. Sandy [Sandra]." Trial Tr. vol. 5, 93:16-24. This, however, would hardly justify giving these women the right to acquire businesses worth multi-millions of dollars.

[207] The Nominee Defendants argue that because payment of consideration was required to exercise the Options, the Options cannot be simulations under Louisiana law. Defendants' Post-Trial Brief (Doc. No. 438). But the Court looks to whether the Options were simulations at their inception, the terms of which were negotiated between Faia and Decossas on one side and Solares and Gardner on the other. And because the Court finds that all four men understa that the Options intentionally misstated their true purpose, which was to enable Solares and Gardner (not Vivian and Sandra) to enjoy full ownership rights in the Three Companies, the fact that the Options call for payment of consideration if and when they are exercised is irrelevant. Further, to the extent the defendants would assert that the Nominee Defendants were given rights to exercise the Options as donations or gifts, such assertion is overshowed by evidence that Solares and Gardner continued to exercise control over the Options, treating the rights in the Options as belonging to them, not to the Nominee Defendants. *See Gurley* (M.D. Fla. Sept. 3, 1999) (affirmed bankruptcy court's determination that evidence that transfer of a company from husband to wife was intended as a gift overshadowed by evidence that husband continued to exercise control over the company by representing himself as the owner, he maintained possession of the deed, and wife signed documents and checks at his request without understanding their significance).

### 6.  *Payment of Expenses*

As recited above, when considering if a purported transfer was made to a mere nominee or, similarly, if a purported transfer is a simulation, courts in Florida and Louisiana (respectively), often look to evidence of who pays for expenses related to the subject asset.  On this issue, Vivian testified that although the Debtor made an initial payment to The Silvey Law Firm representing the Nominee Defendants in this proceeding and in the action they filed in Louisiana federal court in March of 2022,[208] she has since taken over her share of these expenses using Bitcoin she purchased with her own money.[209]  Although this factor alone may not have carried the day given the other factors considered, Vivian might have successfully shifted the Court's thinking regarding litigation expenses had her self-serving testimony been bolstered by a tracing of the purchase of the Bitcoin to funds that originated with her (and not planted by her brother), checks made out to law firms, and redacted copies of bills showing a reconciliation of payments to charges. But no corroborating evidence of this nature was presented.  In addition, regarding expenditures to exercise the Option to purchase DNC, Solares testified that he would, if needed, pay the purchase price, and probably contemplated all along that he would do so.[210]  he estimated price $350,000.[211]

Solares and Gardner never attempted to exercise the Options directly.  They did, however, almost certainly spend considerable amounts of money funding their efforts in the Louisiana Action and (through TPI) the Joint Proceeding to reacquire for their own benefit the assets transferred to the Three Companies, profits derived from those assets, and/or to substantively consolidate those companies into TPI — not to mention Solares' personal guarantee of TPI's financial obligation to The Silvey Law Firm.  And as mentioned above, Solares conceded to still

---

[208] Trial Tr. vol. 1, 201:6-202:16.
[209] Trial Tr. vol. 1, 273:3-10.
[210] Trial Tr. vol. 5, 82:22-83:5.
[211] Trial Tr. vol. 5, 83:10-16.

owing Huber a million dollars.   Thus, Solares and Gardner's expenditures and obligations associated with efforts to take back the assets transferred to the Three Companies or otherwise reap the benefit from those assets, and thereby reach a result equivalent to exercising the Options, significantly outweighs expenditures made by Vivian or by Sandra before she passed away, if either woman made any at all.   Thus, the evidence related to consideration of payment of expenses shows that this factor also falls in favor of the plaintiffs.

### *Conclusion*

When the plaintiffs rested their case, the Court was left with a definite and firm conviction that the only interests Vivian and Sandra held in the Options (assuming they were ever fully executed) were in name only and that Solares and Gardner were the true holders of such interests.  At that point, the burden shifted to the defendants to refute by contradictory evidence of equal weight the plaintiffs' contentions concerning — primarily — intent, control, and, ultimately, beneficial ownership by Solares and Gardner.  The defendants' evidence, primarily self-serving trial testimony, fell short of the required quantum.  Based on the trial record, the Court finds and concludes that although the Options identify Vivian and Sandra as the potential purchasers, the Options were drafted for the benefit of Solares and Gardner to shield their assets from liability until they could regain full ownership of the Three Companies without adverse consequences or sooner if Faia and Decossas ceased to operate these businesses for the benefit of Solares and Gardner.

This ruling is amply supported by clear and convincing evidence buttressed by reasonable inferences — where the evidence is circumstantial — and the Court's credibility assessments of the witnesses.  Most compelling is the overwhelming evidence in the form of contemporaneous oral and written communications establishing the true purpose — the original intent — of the

Options.  The weight of the evidence is bolstered by what the Court considers undeniable evidence that until the point in time when Solares engaged Guardian Law to represent the Nominee Defendants in their efforts to exercise the Options, Solares and Gardner were the only ones who acted as though they had the right to exercise and control the Options and were entitled to profits generated by the Three Companies.  Vivian and Sandra engaged in no such conduct.  The compelling evidence of intent and control together with evidence regarding the substantial financial threats looming at the time the Options were created, the lack or inadequacy of any consideration given to acquire the purchase rights stated in the Options, payment of related expenses, and the close family relationships involved all lead to a high probability if not a reasonable certainty that Vivian and Sandra held the equivalent of only bare legal title in the Options, while Solares and Gardner at all relevant times continued to enjoy the true, beneficial ownership of the Options.  This ruling applies whether Vivian and Sandra were mere "nominees," that the Options were "simulations," or some similar theory.  The Option rights clearly belonged to the men, "[i]rrespective of the name by which this 'rose' is called,"[212] and those rights were released in the Settlement Agreement.

The Court will enter a separate judgment in the plaintiffs' favor on Count III of the Amended Complaint that enjoins the Nominee Defendants, TPI, Solares, Gardner, their agents, assignees, and designees from any attempt to exercise the Options to acquire assets that Solares and Gardner released in the Settlement Agreement.  The judgment will include a statement that it is a final judgment, even though it is a judgment on less than all counts, because there is no just reason to delay the finality concerning Count III.[213]  Appellate review of the Count III judgment should occur, if sought, before the parties incur the expense of litigating the remaining counts.

---

[212] *See infra* note 69.

[213] *See* Fed. R. Civ. P. 54(b).